UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GAS NATURAL SDG, S.A.,

       Plaintiff,

    -against-

E.ON AG and E.ON ZWÖLFTE VERWALTUNGS
GMBH,
       Defendants.

Case No. **06 CV 13607**



## COMPLAINT

Plaintiff Gas Natural SDG, S.A. ("Gas Natural"), by its undersigned

attorneys, as and for its complaint in this action, alleges upon knowledge as to itself and

its own actions, and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.     On November 17, 2006, defendant E.ON AG (together with its co-

defendant subsidiary, "E.ON"), filed a materially false and misleading preliminary tender

offer statement (the "E.ON Schedule TO") with the United States Securities and

Exchange Commission (the "SEC") in violation of Section 14(d)(1) of the Securities

Exchange Act of 1934 for the shares of Endesa, S.A ("Endesa").  Plaintiff Gas Natural

has also submitted a tender offer and seeks by this action injunctive relief to require

E.ON to provide curative disclosure that is accurate and complete before further pursuing

its tender offer for the U.S. shares of Endesa.  Plaintiff further seeks to enjoin Defendant

E.ON from purchasing shares of Endesa from U.S. holders unless and until E.ON

discloses all of its negotiations, material contracts, agreements and understandings with

Endesa or its affiliates, and E.ON or Endesa disclose all material non-public information provided to E.ON by Endesa.

2.     More than a year ago, on September 5, 2005, plaintiff Gas Natural – the largest supplier of natural gas in Spain, and also a distributor of electricity and other energy-related products and services – announced its intention to acquire 100% of the outstanding ordinary shares and American Depositary Shares ("ADSs") of Endesa, the largest electric company in Spain. Because approximately 15.3% of Endesa's shares are held by U.S. shareholders, Gas Natural is conducting two simultaneous tender offers, one in Spain and one in the United States. On March 6, 2006, Gas Natural filed its Registration Statement on Form- F-4 with the SEC in furtherance of its U.S. offer for Endesa's ordinary shares held by persons resident in the U.S. and for Endesa's ADSs— which are traded on the New York Stock Exchange—held by persons resident anywhere.

3.     Endesa's management vigorously opposed Gas Natural's offer and actively solicited bids from other energy companies. Defendant E.ON's bid for Endesa, first announced on February 21, 2006 and also conducted as dual offers in Spain and the United States, is the result of those efforts.

4.     The E.ON Schedule TO is false and misleading in three ways.

5.     *First*, the E.ON Schedule TO falsely states that E.ON's bid is based on public information, when in fact E.ON's bid is based on material, non-public information that E.ON has obtained from Endesa, both directly and through E.ON's and Endesa's mutual advisor Deutsche Bank—none of which material, non-public information is disclosed in the E.ON Schedule TO.

6.     E.ON gained access to material, non-public information during a series of

2

meetings between the most senior executives of Endesa and E.ON and representatives of Deutsche Bank. From at least September 2005 through the announcement of E.ON's tender offer in February 2006, E.ON admits to the following contacts with Endesa: (i) Deutsche Bank had two conference calls with E.ON's Senior Vice President of Corporate Development about the possibility of E.ON submitting a bid for Endesa; (ii) E.ON's CEO had five meetings or conference calls with Endesa's CEO regarding E.ON's bid for Endesa; (iii) officials at both companies spoke "on almost a daily basis" in the time period just prior to the public announcement; and (iv) E.ON conducted multiple diligence meetings in Munich and Madrid to review "operational, financial and legal matters" regarding Endesa.

7.      In the middle of all these contacts, E.ON and Endesa entered into a confidentiality agreement on January 16, 2006. E.ON's senior management has been extensively quoted in the press saying that its discussions with Endesa have been friendly and that the information obtained from Endesa in these private meetings was the "information [E.ON] needed" to make its tender offer. There is every reason to believe that the extensive cooperation between E.ON and Endesa continued after the public announcement of E.ON's offer and continues today.

8.      E.ON also obtained material non-public information from Deutsche Bank, which has served as an advisor to *both* E.ON and Endesa in connection with E.ON's bid for Endesa. Deutsche Bank served as a "financial advisor" and "fairness opinion advisor" to Endesa in reviewing Gas Natural's tender offer for Endesa. In those roles, Deutsche Bank gained access to and reviewed material, non-public information about Endesa, its operations, its financials, and its financial projections. At the same time that

3

Deutsche Bank was advising Endesa with respect to Gas Natural's offer, Deutsche Bank was also advising E.ON with respect to structuring E.ON's tender offer for Endesa and assisting E.ON with securing the necessary financing for its offer. As the E.ON Schedule TO confirms, Deutsche Bank serves as bookrunner and underwriter for the syndicated facility that provides the financing for E.ON's offer, and as guarantor for the execution and payment of the sale and purchase prices resulting from E.ON's Spanish offer.

9.      *Second,* E.ON's Schedule TO is false and misleading because it states that E.ON and Endesa have not reached any material agreements. Press reports and E.ON's own Schedule TO indicate that, to the contrary, E.ON and Endesa have reached agreements that the current senior management of Endesa will retain their senior positions after a takeover by E.ON and will support the E.ON offer and that E.ON and Endesa will coordinate their efforts to secure approval of the E.ON offer.

10.      *Third,* the E.ON Schedule TO is false and misleading because it misleadingly downplays the risks to the viability of E.ON's tender offer reflected in an October 25, 2006 order by a Barcelona court. Contrary to the disclosure in the Schedule TO, there is a significant possibility, if Gas Natural is able to show that E.ON and Endesa improperly colluded to encourage acceptance of E.ON's tender offer and rejection of Gas Natural's tender offer, that the Spanish Court could nullify E.ON's tender offer for Endesa or impose other sanctions. The Spanish Court has already granted Gas Natural's application for the equivalent of pre-complaint discovery from, among others, E.ON, Endesa and Deutsche Bank, based on the court's finding that it was "sufficiently probable" that E.ON and Deutsche Bank had access to non-public information about Endesa. The Spanish Court has ordered that relevant documents be produced to the

4

Spanish Court for its review, though these documents will not necessarily ever be

provided to Gas Natural. Endesa shareholders are entitled to know about the risk of the

nullification of E.ON's tender offer when deciding which, if any, offer to accept.

11.    E.ON, through the knowledge of its senior managers including, but not

limited to, its Chief Executive Officer Mr. Wulf Bernotat, had actual knowledge of the

foregoing misstatements or omissions because Endesa provided information on which

E.ON based its bid only after E.ON had entered into a confidentiality agreement, because

the "information [E.ON] needed" was provided in non-public discussions between E.ON

management (including Bernotat) and Endesa management, and because E.ON has

conducted thorough diligence of Endesa including a review of the publicly available

information about Endesa and therefore knows that E.ON has received supplementary

material information that is not public.

12.    Endesa's shareholders—including shareholders in the United States—are

being injured by the materially false and misleading Schedule TO, and absent the judicial

relief requested herein will suffer irreparable harm, because without access to the

material, non-public information available to E.ON, Endesa shareholders cannot make an

informed decision about whether they are obtaining the best price for their shares or

whether they should retain their shares and not participate in either bid, and are deprived

of the benefit of a possible competing Gas Natural bid based on accurate and complete

information.

13.    Gas Natural also is injured by E.ON's materially false and misleading

Schedule TO. Gas Natural is unable properly to compete for Endesa shares both because

Endesa shareholders are being misled regarding the basis for and risks associated with the

5

E.ON offer, and because in formulating its current and prospective sealed bids, Gas

Natural has been deprived of the material non-public information on which E.ON is

basing its bids.

14.    The injury to shareholders is both imminent and irreparable. In opposing

the Gas Natural tender offer, Endesa filed no fewer than 14 actions against Gas Natural in

this Court, in courts in Spain, and in courts of the European Union, seeking to block Gas

Natural's offer. As a result of one of those actions, Gas Natural's offer for Endesa has

been enjoined pending decision by a court in Madrid of an antitrust claim by Endesa

against Gas Natural. Gas Natural's bid has also further been enjoined by the Spanish

Supreme Court's suspension of the Spanish Government's approval of Gas Natural's bid

pending a ruling on the merits of certain other claims brought by Endesa. By operation

of Spanish law, the only other bid for Endesa—the E.ON bid—is also enjoined until Gas

Natural's offer can go forward.

15.    On November 17, 2006, the same day that E.ON's bid for Endesa was

approved by the Spanish securities regulator (the Comisión Nacional del Mercado de

Valores, or "CNMV"), Endesa announced its intention to request that the injunctions

imposed by the Madrid court and the Supreme Court against Gas Natural's bid be lifted.

The injunctions are expected to be lifted as early as December 2006.

16.    Pursuant to Spanish law, once the injunctions are lifted, the Spanish

securities regulator CNMV will issue a notice permitting Gas Natural and E.ON to

submit final, sealed bids for Endesa's shares. Within the following five business days

from the date on which the CNMV makes such a request, Gas Natural and E.ON have the

opportunity to submit final sealed bids for Endesa's shares. If there is more than one bid,

6

the CNMV will announce the winner of the sealed bids the following day and the winner will then be able to formally commence its offer and acquire shares of Endesa. After that sealed bid is submitted, neither E.ON nor Gas Natural will be able to raise its bid again for any reason.

17.     If E.ON is still in possession of material, non-public information that has not been disclosed to Gas Natural at the time the sealed bids are submitted, E.ON will have an unfair advantage in determining its bid. Because the U.S. offer and Spanish offer must be at the same price, this unfair advantage for E.ON will harm both Gas Natural and Endesa's U.S. shareholders by preventing the fair competition for Endesa shares that would provide shareholders the best possible price.

18.     This imminent injury is also irreparable. It will be effectively impossible to "unscramble the eggs" if E.ON completes its tender offer based on the false and misleading E.ON Schedule TO and purchases all or a substantial portion of Endesa's shares. E.ON's tender offer involves two proceedings – a Spanish offer to non-U.S. shareholders and a U.S. offer to U.S. shareholders – which under Spanish law must be conducted in parallel with each other. This requisite structure would prevent the Court post-consummation of the E.ON tender offer from fashioning a remedy to place Gas Natural in a position equivalent to that which it would occupy in the absence of the materially false and misleading E.ON Schedule TO. Whatever remedies might be available to this Court with respect to the U.S.proceeding, it is highly doubtful that the Court could unwind the Spanish transaction. And because any U.S. offer must be accompanied by a parallel Spanish offer, the Court also effectively could not direct that Gas Natural be permitted to conduct a U.S. tender offer based on corrected information.

7

The only manner in which Gas Natural's rights and the rights of U.S. shareholders can be protected is to prevent the U.S. tender offer from being completed until E.ON's disclosures are corrected.

19.    Gas Natural therefore brings this suit to ensure that (i) Endesa's U.S. shareholders are provided with accurate disclosure and complete information on which to base their decision to tender or not to tender their shares; and (ii) E.ON discloses the material, non-public information it has regarding Endesa so that Endesa shareholders and Gas Natural can benefit from a fair competitive bidding process based on appropriate disclosure.

## PARTIES

20.    Plaintiff Gas Natural is a limited liability company organized under the laws of Spain. It is primarily engaged in the business of distributing natural gas, electricity, and other energy-related products and services. Gas Natural is the largest supplier of natural gas in Spain.

21.    Defendant E.ON AG is a German stock corporation headquartered in Düsseldorf, Germany, that is engaged in the energy business, primarily the supply of electricity and natural gas. E.ON is among the largest energy companies in the world, with $66.788 billion in revenues for its fiscal year ended December 31, 2005. E.ON is the second largest industrial group in Germany (measured on the basis of market capitalization at December 2005). Its ordinary shares are listed on all seven German stock exchanges, with its principal trading market being the Frankfurt Stock Exchange, together with XETRA (Exchange Electronic Trading System). In addition, E.ON American depositary shares are listed on the NYSE under the symbol "EON" and are

8

evidenced by E.ON American depositary receipts.

22.     E.ON Zwölfte Verwaltungs GmbH ("E.ON 12") is a German limited liability company and wholly owned subsidiary of E.ON.  E.ON 12 was incorporated for the sole purpose of making tender offers to acquire all of the outstanding shares of Endesa.

23.     Non-party Endesa is a limited liability company organized under the laws of Spain.  Endesa is Spain's largest electricity supplier, engaged principally in the production, transmission, distribution and supply of electricity.  Although the majority of Endesa's shares are held by Spanish investors, approximately 15.3% of its shares are held by U.S. investors.

24.     Endesa's ADSs are traded on the New York Stock Exchange, and Endesa's shares are registered with the SEC pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78*l*.  Endesa's ordinary shares are also traded on the Madrid, Barcelona, Bilbao and Valencia stock exchanges in Spain, and on the Santiago Offshore Stock Exchange in Chile.

## JURISDICTION AND VENUE

25.     This action arises under Sections 14(d) and (e) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78n(d) and (e), and the rules and regulations promulgated thereunder, 17 C.F.R. §240.14d-1, *et seq.*

26.     Jurisdiction over the subject matter is based on 28 U.S.C. § 1331 and Section 27 of the Exchange Act, as amended, 15 U.S.C. § 78aa.

27.     Venue in this district is proper pursuant to Section 27 of the Exchange Act, as amended, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

### Gas Natural Makes a Tender Offer for Endesa Shares

28.     On September 5, 2005, Gas Natural announced its intention to acquire 100% of Endesa's outstanding ordinary shares through a tender offer, including shares represented by Endesa ADSs. Gas Natural indicated that it would offer €7.34 in cash and 0.569 Gas Natural shares for each Endesa share. The bid valued Endesa stock at €21.30 per share and the company as a whole at approximately €23 billion (or $28 billion). By acquiring Endesa, Gas Natural seeks to create an integrated, internationally competitive energy provider. As of Monday, November 27, 2006, the value of Gas Natural's offer (based on the €30.79 closing price for Gas Natural shares) bid had increased to €23.50 per share.

29.     Pursuant to Rule 14d-1 of the Exchange Act, Gas Natural is required to make a U.S. tender offer because more than 10% of Endesa shareholders are U.S. investors. The financial terms and conditions of the U.S. offer (for Endesa ADSs and for Endesa ordinary shares held by U.S. persons) and the Spanish offer are substantially identical.

30.     In the months following its initial announcement, Gas Natural diligently worked to obtain numerous regulatory approvals required for its bid from the appropriate authorities in Spain, the European Union, and the United States.

31.     Gas Natural filed its formal bid for Endesa with the CNMV on February 27, 2006. Gas Natural's offer was approved by the Spanish Government.

32.     On March 6, 2006, the SEC declared effective the registration statement on Form F-4 that Gas Natural filed with respect to the Gas Natural shares to be issued in

10

the U.S. offer. The F-4 registration statement included a prospectus setting forth the

terms and conditions of the Gas Natural tender offer. Subsequently that same day, Gas

Natural commenced its U.S. offer by filing a statement on Schedule TO with respect to

its offer in the United States to acquire all of the outstanding Endesa shares held by U.S.

persons.

### *Endesa Seeks to Block Gas Natural's Tender Offer*

33.   Endesa's management strenuously opposed Gas Natural's bid and took

numerous steps to impede Gas Natural from proceeding with its offer.

34.   First, beginning the day after Gas Natural announced its intention to

submit a tender offer, Endesa actively solicited competing bids from other companies.

As Endesa reported in a Schedule 14D-9 filed with the SEC:

> Since September 6, 2005, the Board of Directors has
> adopted the following resolutions, among others, relating to
> the Gas Natural Offer: a preliminary determination that the
> Offer Price is insufficient and undervalues Endesa's
> business. . . ratification of the decision of the Executive
> Committee to authorize the Chief Executive Officer of
> Endesa **to provide information to third parties** under
> strict conditions of confidentiality in order to benefit
> shareholders by **facilitating higher bids**. . . .

Endesa 14D-9, filed March 7, 2006, at 19 (emphasis added).

35.   Upon information and belief, Endesa solicited E.ON to acquire 24% of its

share capital, the maximum amount permissible under Spanish law without making a

formal tender offer, for the express purpose of hindering and defeating Gas Natural's

tender offer.

36.   In a press conference in Madrid on March 3, 2006, and as recounted in the

Spanish newspaper *ABC* on March 4, 2006, E.ON's president and Chief Executive

Officer expressly acknowledged that E.ON initially intended only to commence an offer for 24% of Endesa shares.

37.    E.ON's initial proposal was expressly formulated to block Gas Natural's offer. Gas Natural's offer was conditioned on the acquisition of at least 75% of the capital of Endesa. If E.ON acquired 24% of Endesa's shares, then E.ON, along with Caja Madrid, a shareholder which owns 9% of Endesa and which has opposed Gas Natural's offer, could block Gas Natural's bid. Such strategy on the part of the target and a competing bidder is expressly prohibited by Spanish tender offer rules. E.ON has not disclosed this joint effort with Endesa in its Schedule TO because it is in violation of Spanish law.

38.    Second, Endesa sought to amend its financial statements in an effort to delay and disrupt Gas Natural's tender offer. Specifically, in 2005, Endesa tried to apply retroactively International Financial Reporting Standards to its 2004 financial statements, rather than Spanish generally accepted accounting practices, in an effort to persuade the European Commission and not the Spanish Government to assume jurisdiction over Gas Natural's proposed tender offer for Endesa shares. Endesa's improper gambit was rejected in July 2006, when the European Union Court of First Instance ruled that the Spanish authorities had jurisdiction over Gas Natural's tender offer.

39.    Third, Endesa sought to block the required approvals from regulators in the energy, antitrust and securities areas in Spain, the European Union, and the United States. Endesa also filed 14 separate legal actions seeking to block the Gas Natural offer.

40.    Gas Natural defeated the great majority of Endesa's evasive measures. However, by order dated March 21, 2006, a Commercial Court in Madrid enjoined Gas

Natural from proceeding with its bid pending the outcome of an antitrust claim advanced by Endesa. In addition, Endesa appealed to the Spanish Supreme Court the Spanish Government's approval of the Gas Natural bid. By order dated April 28, 2006, the Spanish Supreme Court temporarily suspended that approval until it could rule on the merits of Endesa's claims. This suspension effectively operated as a second injunction against Gas Natural's bid.

### *Endesa Provides E.ON with Access to Material, Non-Public Information*

41.     Between September 5, 2005 (when Gas Natural announced its tender offer) and February 21, 2006 (when E.ON announced its tender offer), Endesa, E.ON, and Deutsche Bank had numerous significant contacts.

42.     Under Spanish law, a target company such as Endesa must not take actions that unfairly favor one bidder over another. Nevertheless, Endesa and E.ON engaged in many significant contacts concerning the possibility of E.ON making a tender offer for Endesa. Part of E.ON's motive not to disclose material non-public information it received from Endesa is that to concede that it received such information in furtherance of Endesa's plan to favor E.ON over Gas Natural would concede that Endesa management, with E.ON's assistance, violated Spanish law.

43.     Contacts among Endesa, E.ON and Deutsche Bank began—at the latest—in September 2005. E.ON's Schedule TO reports that in "September and October 2005," "Dr. Dierk Paskert, Senior Vice President of Corporate Development of E.ON, and Citigroup and Deutsche Bank, financial advisors to Endesa in connection with Gas Natural's bid, discussed the possibility of E.ON making an offer for Endesa."

44.     According to E.ON's Schedule TO, those contacts continued throughout

13

December 2005 and January 2006.  On December 12, 2005, E.ON's CEO, Wulf

Bernotat, and Endesa's CEO, Rafael Miranda, and other representatives met in Essen,

Germany "to discuss various options with respect to Gas Natural's proposed offer for

Endesa, including the possibility of E.ON making an offer for Endesa."  On January 5,

2006, Bernotat and Miranda met again to continue discussing E.ON's bid for Endesa.  On

January 9, 2006, Bernotat and Miranda had a telephone conversation during which they

discussed further the possibility of E.ON making an offer for Endesa.

>        45.      On January 16, 2006, E.ON entered into a confidentiality agreement with
>
> Endesa.
>
>        46.      Subsequent to entering into the confidentiality agreement, E.ON and
>
> Endesa senior management met repeatedly, negotiated terms, and exchanged significant
>
> amounts of confidential information pursuant to the confidentiality agreement.  As
>
> Endesa's Schedule TO reports:

>> January 25, 2006 - Representatives of E.ON and Endesa
>> met in Munich, Germany, and E.ON purportedly conducted
>> a "limited" due diligence review of "operational, financial
>> and legal matters" regarding Endesa;
>>
>> February 1, 2006 - E.ON again met with Endesa in Madrid,
>> Spain, to continue the due diligence review;
>>
>> February 3, 2006 - CEOs Bernotat and Miranda discussed
>> in a telephone conversation the possible **timing and
>> process of a potential offer** by E.ON for Endesa;
>>
>> February 9, 2006 - Bernotat, Miranda and others met again
>> in Paris, France, to further discuss **details of the potential
>> offer;**
>>
>> In the period immediately before E.ON announced its offer
>> for Endesa, telephone conversations took place between
>> E.ON and Endesa "almost on a daily basis;" and

14

> February 20, 2006 - CEO Bernotat gave CEO Miranda
> advance notice of the filing of E.ON's offer document with
> the CNMV. That same day E.ON publicly announced its
> intention to make an offer to acquire all the outstanding
> shares of Endesa.

47.    Thus, prior to the first public announcement of E.ON's offer for Endesa,

the following contacts and communications took place between E.ON and Endesa: (i)

two conference calls between Endesa's financial advisors and E.ON's Senior Vice

President of Corporate Development; (ii) five specifically mentioned meetings or

conference calls between the CEOs of E.ON and Endesa; (iii) conference calls between

E.ON and Endesa representatives "on almost a daily basis" in the time period just prior to

the public announcement; and (iv) multiple diligence meetings in Munich and Madrid to

review "operational, financial and legal matters" regarding Endesa.

### Endesa Hires Deutsche Bank to Provide Financial Advice on Gas Natural's Offer

48.    During this time period, Endesa retained Deutsche Bank for the purported

purpose of providing financial advice in connection with Gas Natural's tender offer.

Specifically, Endesa paid Deutsche Bank to act as a "financial advisor" and as a "fairness

opinion provider."

49.    Between September 2005 and March 2006, Deutsche Bank reviewed Gas

Natural's tender offer for Endesa. In that capacity, Deutsche Bank had access to

material, non-public information about Endesa, its operations, its financials, and its

financial projections.

50.    On or about March 7, 2006, Deutsche Bank provided Endesa's Board of

Directors with an opinion, "as Financial Advisor to Endesa," concerning the adequacy of

Gas Natural's offer. Deutsche Bank's letter stated that "in connection with Deutsche

15

Bank's role as financial advisor to Endesa," Deutsche Bank reviewed publicly available information and "also held discussions with members of the senior management of Endesa regarding the business and prospects of Endesa." The clear implication is that Deutsche Bank's discussions with members of Endesa's senior management about Endesa's "business and prospects" included material, non-public information, likely including management's internal financial projections.

51. Deutsche Bank ultimately concluded that Gas Natural's offer was "inadequate."

### Deutsche Bank Provides Financial Advice to E.ON in Its Bid for Endesa

52. At the same time that Deutsche Bank was working for Endesa and evaluating Gas Natural's tender offer, Deutsche Bank also was advising E.ON with respect to a potential bid by E.ON for Endesa shares.

53. As E.ON's Schedule TO reported, Deutsche Bank discussed with E.ON in September and October 2005 the possibility of E.ON making an offer for Endesa.

54. Deutsche Bank has continued to advise E.ON regarding a potential tender offer from that time forward.

55. As E.ON's Schedule TO reports, Deutsche Bank acted as agent and "mandated lead arranger" for E.ON. In connection with E.ON's tender offer for Endesa, Deutsche Bank agreed to loan € 4 billion to E.ON. Deutsche Bank also serves as the lead arranger for the financing for the remainder of E.ON's bid and has arranged for E.ON to borrow € 37.1 billion (currently $48.2 billion) for the Endesa acquisition.

### E.ON Offers a Large Premium over the Market Price

56. On February 21, 2006, E.ON announced its intention to make a tender

offer to acquire all of Endesa's outstanding shares for €27.50 per share in cash, an offer which valued Endesa at €29.1 billion (currently $37.8 billion).

57.    E.ON's initial tender offer was at a considerable premium of 48.2% above the price of Endesa shares as of September 2, 2005, the last trading day before the price of Endesa shares was affected by Gas Natural's tender offer and the subsequent rumors of additional competing bids. E.ON's tender offer was also at a considerable premium of 50.1% above the average share price of Endesa in the previous six months. E.ON's later announced offer of €35 per share is an even higher premium of approximately 88% above the price of Endesa shares as of September 2, 2005.

58.    Press reports quoting E.ON executives confirm the degree to which E.ON relied on information it received from Endesa in formulating E.ON's prospective bid.

59.    For example, on February 22, 2006, the Spanish newspaper *El País* reported:

> According to the explanation given a press conference
> called yesterday in Madrid, the president of E.ON, Wulf
> Bernotat, the German offer, with HSBC Bank as financial
> adviser, has been in **negotiation with Endesa** for two and a
> half months "in a **friendly atmosphere**."

60.    Similarly, on February 26, 2006 the Spanish newspaper *El Periódico de Catalunya* reported that:

> The first meeting was held on December 1 in Essen
> (Germany) and the second on January 5 in Madrid,
> although there have been other subsequent encounters. The
> two companies jointly analyzed a competitive bid with that
> of Gas Natural. **They agreed to exchange information** in
> accordance with Spanish regulations and signed a
> confidentiality document.

61.    In an interview given to the Spanish newspaper *ABC* on April 30, 2006,

17

CEO Bernotat stated that:

> But Endesa was trying to reject an undesired attack from
> Gas Natural. Therefore we contacted its management team
> to see if we could come in and we had **a series of meetings
> to exchange information**, within the strict legal framework
> of Spanish law. **After getting the information that we
> needed, we prepared our offer.**

62.   E.ON could have obtained any public information regarding Endesa

without meeting with Endesa management or entering into a confidentiality agreement.

The information referenced here by the E.ON CEO is non-public information. It is

certainly material because it is information that E.ON needed to make its offer, and

therefore is information that a reasonable investor would find to affect or alter the total

mix of information available for making a tender decision.

63.   CEO Bernotat has acknowledged that the Board of Directors of Endesa

has provided a great deal of information about the company to E.ON:

> In Spain there is a rule that the company that has been
> attacked has a certain price and certain restrictions. ( . . .).
> They cannot be too active in their contact with potential
> third parties. But they are allowed, very clearly are
> allowed, legally, to provide information to companies like
> ourselves who show an interest in analyzing and studying
> the counter bid. And that's what happens. **We've got a lot
> of information in this process from the Endesa
> management**. And therefore, as we said, we have a pretty
> good understanding of the regulation. And Endesa, indeed,
> has also published documents which are public knowledge
> about their own plans and programs going up to 2009. And
> they were also subject of **internal discussions with the
> Endesa management**."

February 21, 2006 Conference Call with Analysts (transcript filed with the

SEC).

64.   In a very concrete example that non-public information was shared with

18

E.ON, during a February 21, 2006 conference call, E.ON CEO Bernotat responded to a question posed by Richard Smith, an analyst, with respect to the rights of ASM Brescia in Endesa Italia (a subsidiary of Endesa) as a result of a change of control at Endesa. Bernotat stated:

> No.  The second question is a simple no.  There are no preemption rights which would come into force in this transaction because it's only a change of the shareholder structure of Endesa itself, and not a sale of the Italian assets.

This assertion refers to the text of a confidential agreement between Endesa and ASM Brescia the substance of which has never been disclosed to Endesa's U.S. shareholders. Bernotat's response indicates that he – and therefore E.ON – has had access to this non-public information.

### Endesa Continues to Meet with E.ON

65.    The extensive cooperation, interaction and sharing of information did not cease upon the public announcement of E.ON's offer in February 2006.  According to E.ON's Schedule TO:

> Immediately following the public offer, the CEOs of E.ON and Endesa held a conference call to discuss the "next steps" in E.ON's offer;
>
> February 21, 2006 - After the filing of E.ON's application for approval of its offer with the CNMV, CEO Bernotat and Mr. Pizarro, Chairman of Endesa, discussed in a telephone conversation the next steps of the Spanish Offer;

March 3, 2006, CEO Bernotat and CEO Miranda met in Madrid to further discuss the development of E.ON's Spanish offer. Also on that date, representatives of E.ON and Endesa met in order to discuss the implications of the newly adopted Spanish law that required E.ON to file with the Spanish National Commission for Energy (Comisión Nacional de Energía) an application for authorization of E.ON's Spanish offer;

Representatives of Endesa and E.ON met in Madrid on March 17, 2006, April 19, 2006, April 26, 2006, May 18, 2006, May 22, 2006, June 1, 2006, June 7, 2006, June 19, 2006, July 13, 2006, September 1, 2006, September 6, 2006, September 28, 2006, October 10, 2006 and November 6, 2006, to further discuss E.ON's offer;

June 11, 2006 - E.ON and Endesa met in Madrid to discuss CNE procedures;

July 11, 2006 - E.ON and Endesa met in Madrid to discuss CNE procedures;

July 25, 2006 - CEO Bernotat and CEO Miranda met in Madrid to discuss Endesa's results for the first two quarters of the year 2006;

August 21, 2006 - Representatives of E.ON and Endesa met to discuss communication measures regarding the conditions that the Spanish National Commission for Energy (Comisión Nacional de Energía) imposed on the E.ON bid;

September 13, 2006, E.ON and Endesa met in Madrid to discuss "corporate governance issues;" and

Counsel for Endesa and E.ON met in Madrid on several occasions to discuss the E.ON offer.

66.     E.ON also met with Endesa's most significant shareholders. On March 15, 2006, E.ON met with Caja Madrid, Endesa's largest shareholder, to discuss E.ON's offer for Endesa. On September 28, 2006, CEO Bernotat personally met with Caja Madrid to discuss the E.ON bid.

*Deutsche Bank's Trading in Endesa Shares*

67.     In between August 4, 2006 and August 17, 2006, Deutsche Bank purchased approximately 36,000,000 shares of Endesa or approximately 3.4 % of Endesa's total share capital. At the then-prevailing market prices for Endesa shares, those 36,000,000 shares represented approximately € 970 million worth of Endesa shares.

68.     Those purchases raised Deutsche Bank's holdings of Endesa to 5.236% of Endesa's share capital.

69.     On September 8, 2006, Gas Natural sent a letter to the SEC complaining that Deutsche Bank had violated Rule 14e-5 and Section 13(d) of the Exchange Act by trading in Endesa shares on the basis of material, non-public information and by failing to disclose its purchases of Endesa, which it was required to do once it held more than 5% of Endesa's share capital.

70.     On or about September 19, 2006, the Spanish press reported that Deutsche Bank had sold 0.35% of Endesa's share capital, thus reducing its holdings to 4.88% of Endesa's share capital. Although not curing the violations of Rule 14e-5 and Section 13(d), Deutsche Bank's sale may have been undertaken to reduce Deutsche Bank's holdings below 5% in order to avoid further reporting requirements concerning its trading.

71.     On November 23, 2006, the Spanish Press reported, based on information from sources close to Endesa, that Deutsche Bank had sold additional shares constituting

21

approximately 3% of Endesa's share capital, further reducing its holdings to approximately 1.7% of Endesa's share capital.

***Spanish Court Decision***

72.     Based on the actions described above, Gas Natural sought "preliminary measures," which is similar to pre-complaint discovery, in Spanish court in July and September 2006.

73.     Specifically, Gas Natural alleged in that action that Endesa, E.ON, and Deutsche Bank had engaged in unfair competition because E.ON was able to obtain material, non-public information that it used in making its tender offer and that it did not disclose, in violation of Spanish law.

74.     On October 25, 2006, the Barcelona Court granted Gas Natural's request for preliminary measures, finding that it was "sufficiently probable" that E.ON and Deutsche Bank had access to material, non-public information about Endesa and ordering E.ON, Deutsche Bank, and Endesa to turn over to the Barcelona Court documents requested by Gas Natural.  It is unknown whether and when any of these documents may be provided to Gas Natural.

75.     Specifically, the Barcelona Court found that it was "sufficiently probable" that E.ON "had access to the information . . . qualified as privileged" and "not accessible to the market," based on:

> the Endesa Board's opposition to Gas Natural's bid and its search for a "white knight" to offer a competing bid;
>
> the exchange of information between Endesa and E.ON over a period of two months pursuant to a confidentiality agreement, when, by definition, "confidential is what is not accessible to the market";
>
> reports of Endesa's management, interviews by E.ON's and

22

> Endesa's CEOs, press reports, and an analyst call transcript
> describing extensive contacts between E.ON and Endesa
> concerning exchange of information and negotiations about a
> potential tender offer;
>
> the fact that Endesa delivered "abundant documentation" to
> E.ON;
>
> statements of E.ON's CEO regarding certain aspects of Endesa's
> operations that appeared not to be based on publicly-available
> information; and
>
> the significant premium of E.ON's bid over the prevailing
> market price for Endesa shares prior to Gas Natural's tender
> offer and over the previous six months.

76.    The Barcelona Court ordered E.ON and Endesa to produce for the court's

review nine categories of documents and information relating to contacts between E.ON

and Endesa.

77.    The Barcelona Court also found that "it is logical that [Deutsche Bank]

had access to ENDESA information which can be qualified as privileged," based on:

> Deutsche Bank's conflicting roles "advis[ing] and stud[ying]
> ENDESA when ENDESA issued a report on the bid of Gas
> Natural" while simultaneously assisting E.ON in financing its
> competing bid for Endesa;
>
> the fact that "two directors of Deutsche Bank are members of the
> Board of Directors of E.ON";
>
> the fact that Deutsche Bank purchased a significant number of
> shares of Endesa following E.ON's bid, even though it did not
> have any significant holdings in Endesa prior to that date;
>
> the presumption that Deutsche Bank would have analyzed
> Endesa's operations extensively before agreeing to provide
> significant financing for E.ON's bid; and
>
> the fact that Deutsche Bank would benefit from the acceptance of
> E.ON's bid.

78.    The Barcelona Court ordered Deutsche Bank to produce for the court's

review thirteen categories of documents and information relating to contacts between E.ON and Endesa and its own trading in Endesa shares.

79.     Gas Natural's allegations of illegal behavior by Endesa, E.ON and Deutsche Bank, the Barcelona Court found, could give rise to "huge economic consequences" and could be accompanied by "sanctions imposed by the regulatory agency" (the CNMV) and "even the annulment of [E.ON's] takeover bid."

### E.ON Files Its False and Misleading Schedule TO

80.     On November 16, 2006, the CNMV approved E.ON's bid for Endesa. According to an E.ON press release issued on November 17, 2006, the CNMV was the final authorization from Spanish and European authorities required for E.ON's offer for Endesa. Due to the existing injunctions in Spain against Gas Natural's offer, however, E.ON presently is precluded by Spanish law from formally commencing its offer.

81.     On November 17, 2006, E.ON filed with the SEC a Schedule TO, which E.ON characterized as "informational" and which contains the information that would be included in its offer to purchase when it formally commences the U.S. component of it's bid.

82.     E.ON's Schedule TO is materially false and misleading for all of the reasons described herein.

### The Tender Offer Process Is Nearing Completion

83.     Under Spanish law, the formal tender offer process cannot commence until all regulatory and legal hurdles for both bids (including the injunctions pending against Gas Natural) have been lifted.

84.     On November 17, 2006, the same day that E.ON's bid for Endesa was

24

approved by the CNMV and that E.ON filed its Schedule TO, Endesa announced that it would seek to lift both injunctions against Gas Natural's tender offer, so that the offer by E.ON could be formally considered.

85.     Specifically, Endesa announced that it intended to apply to the Third Circuit of the Supreme Court a request to modify, or, in the alternative, to lift the injunction against the February 3, 2006 ruling of the Spanish Council of Ministers authorizing Gas Natural to take control of Endesa.  Endesa announced that it will request that the injunction against the Council of Ministers' ruling be replaced by an injunction suspending the voting rights of Endesa shares that Gas Natural may acquire if its takeover bid is successful.  If the court does not grant this request, Endesa indicated that it will ask that the aforementioned injunction be lifted.  Endesa also announced that it will ask Madrid's Mercantile Court Number 3 to lift the injunctions against further action on Gas Natural's takeover bid.

86.     These injunctions are expected to be lifted as early as December 2006. Pursuant to Spanish law, once the injunctions are lifted, the Spanish securities regulator CNMV will issue a notice permitting Gas Natural and E.ON to submit final, sealed bids for Endesa's shares.  Within the following five business days from the date on which the CNMV makes such a request, Gas Natural and E.ON have the opportunity to submit final sealed bids for Endesa's shares.  If there is more than one bid, the CNMV will announce the winner of the sealed bids the following day and the winner will then be able to formally commence its offer and acquire shares of Endesa.

87.     E.ON and Gas Natural will each have only one opportunity to raise their bids and submit them in "sealed envelopes" to the CNMV.

25

88.     Under Spanish law, the U.S. tender offer price must be the same as the Spanish offer price. Accordingly, the "one-raise" rule is effectively imposed on the U.S. tender offer as well the Spanish offer. This is significant. It will prevent the competitive tender offer "bidding" process that the U.S. securities laws generally use to create maximum value for shareholders and to minimize to opportunities for collusion between the target management and a friendly bidder. As a result, symmetry of information and complete disclosure is even more critical here than where the offer is conducted wholly in the United States solely under U.S. bidding procedures and practices.

## FALSE AND MISLEADING STATEMENTS IN THE E.ON SCHEDULE TO

89.     As a document filed pursuant to a tender offer for U.S. shares, E.ON's Schedule TO must comply with Sections 14(e) of the Exchange Act, which provides that "it shall be unlawful for any person to make any untrue statement of material fact or omit to state any material fact in order to make the statements made, in the light of the circumstances under which they are made, not misleading."

90.     As alleged in detail herein, E.ON's Schedule TO is false and misleading because it contains affirmative misstatements of material facts that must be corrected and omits material facts that must be disclosed in order to avoid irreparable harm to Gas Natural as well as to shareholders who may otherwise tender their shares in reliance thereupon.

### FALSE AND MISLEADING STATEMENTS: THE E.ON OFFER IS BASED ON "LIMITED" DILIGENCE AND "PUBLIC INFORMATION"

91.     E.ON asserts in its Schedule TO that its tender offer for Endesa is based on "publicly available information (primarily filings by Endesa with the SEC and CNMV)" and that "E.ON conducted only limited due diligence review of Endesa." E.ON

Schedule TO at 21. These statements are false and misleading.

92.     As described throughout this complaint, E.ON and Endesa management met repeatedly and they entered into a confidentiality agreement for the express purpose of sharing *non*-public information.

93.     E.ON executives have repeatedly admitted that they received "information [E.ON] needed" to make its bid during these private meetings with Endesa. E.ON executives have also repeatedly stated that they were working cooperatively with Endesa and receiving information under the terms of the confidentiality agreement.

94.     As the Barcelona Court noted, E.ON's CEO made statements regarding certain aspects of Endesa's operations that did not appear to be based on publicly-available information.

95.     Upon information and belief, E.ON also received material, non-public information about Endesa from Deutsche Bank. Deutsche Bank had access to material, non-public information about Endesa as a result of its role as a financial advisor and fairness opinion advisor to Endesa with respect to Gas Natural's tender offer for Endesa. Deutsche Bank had the opportunity and incentive to transmit this information to E.ON because in addition to its role as advisor to Endesa, it also served as a financial advisor to E.ON on E.ON's tender offer, as well as serving as an underwriter and financing party for E.ON.

96.     E.ON's statements make clear that among the information that E.ON received either from Endesa and/or from Deutsche Bank is non-public information regarding Endesa management's projections of future financial performance.

97.     E.ON's Schedule TO states that its offer is not based on projected

27

"synergy" between E.ON and Endesa. "Synergy" typically refers to cost reductions or enhanced revenue opportunities that become available when one company takes control of another. For example, if both the buyer and the target company have redundant staffs handling a particular aspect of customer service, the combined entity may be able to reduce that staffing and therefore reduce its costs.

98.    Because E.ON has stated that its bid is not based on synergy with Endesa, E.ON must have based its bid on its expectations of Endesa's future financial performance in its current form. The E.ON Schedule TO confirms that E.ON has no plans to make significant changes to Endesa's operations, structure or even its senior management. E.ON Schedule TO at 27-29.

99.    85% of Endesa's total operating revenues are derived from the electricity business in Spain, Portugal and Latin America. E.ON has no significant operations in Spain or in Latin America and therefore no particular expertise in analyzing future prospects in those markets. Its information in that regard would have to come from Endesa.

100.    E.ON CEO Bernotat has stated that Endesa management provided E.ON with non-public information regarding Endesa's future prospects on which E.ON relied. As discussed above, Bernotat was quoted in the press as stating that:

> Endesa, indeed, has also published documents which are public knowledge about their own plans and programs going up to 2009. And they were also subject of **internal discussions with the Endesa management**.

101.    Plans and programs of Endesa management going up to 2009 are material. Bernotat's statement confirms that in addition to public statements made by Endesa regarding those plans, E.ON had "internal" discussions with Endesa management about

28

this material information.  On information and belief, those "internal" discussions

included Endesa providing E.ON with projections of future financial performance and

other information that has not been made public.

102.    That information about future performance also was the basis for E.ON's

increase in its offer to €35 per share in September 2006.

103.    Throughout the period from March to September 2006, E.ON sought to

clear the legal and regulatory hurdles in the European Union and in Spain affecting its

tender offer.  On July 27, 2006, the Spanish National Energy Commission approved

E.ON's offer, but subjected it to a number of conditions including that the combined

company sell about a third of Endesa's generating capacity.  On September 26, 2006, the

European Commission ordered the Spanish National Energy Commission to drop most of

the conditions that it had imposed on E.ON's bid.

104.    Several hours after the European Commission ruling, E.ON announced its

intent to increase its offer for Endesa to € 35 per share following the news that Acciona, a

Spanish company, had purchased 10 percent of Endesa and was prepared to increase its

holdings to as much as 24.9 percent.  (Acciona is reported to have now acquired 20% of

Endesa's share capital.)

105.    This increase in E.ON's offer indicates that E.ON had been provided

material, non-public information that indicated that the the significant premium over the

market price that €35 per share represents was justified.

106.    Similarly, on page 28 of the Schedule TO, E.ON states that it plans to

continue the investment strategy of Endesa with respect to "certain Spanish 'strategic

assets' that are wholly or partially owned by Endesa to keep those Spanish strategic

assets operative." Those "strategic assets" include a pipeline from Algeria to Spain, nuclear power plants and coal fired power plants. While the investments are listed, no information is provided about the projected future economic returns from those "strategic assets." For E.ON to have made a decision to continue Endesa's plans for investment in those "strategic assets," E.ON must have been provided with financial projections that permitted E.ON to determine to its satisfaction that those investments made financial sense. No projections relating to those "strategic assets" are included in the E.ON Schedule TO.

### FALSE AND MISLEADING STATEMENTS: E.ON'S SCHEDULE TO IS FALSE AND MISLEADING BY OMITTING THE MATERIAL, NON-PUBLIC INFORMATION ABOUT ENDESA TO WHICH E.ON HAS ACCESS

107.    As described above, E.ON has access to material, non-public information about Endesa and E.ON has structured its tender offer for Endesa shares on the basis of that material, non-public information.

108.    By omitting that material, non-public information from its Schedule TO, E.ON has rendered that Schedule TO false and misleading and violated the securities laws.

109.    Without access to the material, non-public information available to E.ON, Endesa shareholders cannot make an informed decision in choosing between the competing bids for Endesa shares, and are deprived of a possible competing Gas Natural bid based on complete and accurate information.

### FALSE AND MISLEADING STATEMENTS: E.ON MISCHARACTERIZES THE BARCELONA LITIGATION

110.    E.ON's Schedule TO is also false and misleading because it mischaracterizes the Barcelona Litigation (described above), and specifically, the risk

30

that the Barcelona Court will nullify E.ON's tender offer for Endesa shares.

    111.    Under Spanish law, a target company such as Endesa must refrain from unfairly favoring one bidder over another. Endesa's cooperation with E.ON violates Spanish law, and Gas Natural has brought litigation in Spain seeking to enforce Endesa's duties.

    112.    E.ON's Schedule TO describes that action as follows:

> On July 28, 2006, Gas Natural filed a pre-trial proceeding request with the Court for Business Matters No. 1 in Barcelona (Juzgado de lo Mercantil No.1 de Barcelona) based on the Spanish Unfair Competition Law requesting Endesa, E.ON, HSBC Bank plc, Citigroup Global Markets Limited, J.P. Morgan plc and Deutsche Bank AG (which are referred to as the "Requested Parties") to furnish certain information and documents on the contacts maintained amongst them in connection with the Spanish Offer. On October 25, 2006, the Court for Business Matters No. 1 in Barcelona ordered the Requested Parties to provide copies of certain documents relating to the Spanish Offer within 15 days as from the notification of such decision. The requested documents, relating to the Spanish Offer, include, but are not limited to, the confidentiality agreements entered into by the Requested Parties, Board minutes, minutes of meetings, the agreements and mandate letters among Endesa, E.ON and their respective advisors, due diligence reports, and copies of all mailings amongst the Requested Parties. After the requested documents are furnished, the Court for Business Matters No. 1 in Barcelona will decide which of such documents shall be provided to Gas Natural. This decision will depend on the eventual relevance of such document to serve as a basis for a possible future lawsuit.
>
> The request for pre-trial proceedings does not imply the initiation of further jurisdictional proceedings against the Requested Parties. It is a pre-trial activity only, which purpose is to furnish the requesting party with the sufficient information to decide whether or not to file a lawsuit. No request for precautionary measures has been filed. As of the date hereof, only Endesa has appeared in pre-trial

> proceedings, being the rest of the Requested Parties,
> including E.ON pending to be notified.

E.ON Schedule TO at 44. E.ON's description of the Barcelona Litigation is false and

misleading. The discussion above of the Spanish Court's findings makes it abundantly

clear that E.ON's description fails to accurately portray the substance of the claims in the

Barcelona Litigation and the risks to E.ON's offer from this litigation.

113.    The Schedule TO misstates the actual risks to the viability of E.ON's

tender offer posed by Gas Natural's litigation against E.ON and Deutsche Bank in Spain.

114.    Contrary to E.ON's disclosure, there is a risk that the Barcelona Court

could declare E.ON's offer null and void as a result of its illegal contacts with Endesa if

Gas Natural is able to show that E.ON and Endesa improperly colluded to encourage

acceptance of E.ON's tender offer and rejection of Gas Natural's tender offer.

115.    This risk is material to a decision to tender shares to E.ON rather than to a

competing offeror such as Gas Natural. Endesa shareholders are entitled to know about

the risk of the nullification of E.ON's tender offer when deciding which, if any, offer to

accept.

### FALSE AND MISLEADING STATEMENTS: NO AGREEMENTS BETWEEN E.ON AND ENDESA

116.    E.ON's Schedule TO is also false and misleading because it asserts that

"other than the confidentiality agreement... neither E.ON nor E.ON 12 have reached any

agreement with Endesa, the members of the board of directors of Endesa or any

shareholder of Endesa in connection with the Offers." E.ON Schedule TO at 24.

117.    This statement is false and misleading because there is substantial

evidence of three separate agreements that E.ON and Endesa reached that were not

disclosed in Endesa's Schedule TO.

118.    *First*, upon information and belief, E.ON and Endesa reached agreement

on the terms of E.ON's initial proposed offer for Endesa prior to the public

announcement of the offer.

119.    In a conference call between the CEO of E.ON, Mr. Wulf Bernotat, and

several analysts, held on the same day that the E.ON bid was announced, Mr. Bernotat

stated the following:

> And therefore **we are pretty sure that we are operating on a
> friendly basis with the Endesa management. And the talks we
> have had were very friendly and professional**.
>
> So I think we have to wait for the formal reaction from the Board once
> our bid is approved. **And then they have to recommend** (…).

120.    In the days following the announcement of the offer, E.ON made clear that

based on its discussions with Endesa prior to making the offer, E.ON expected the

support of Endesa management.  On February 22, 2006, the Spanish newspaper *El*

*Periódico de Catalunya*, reported:

> Wulf H. Bernotat, Managing Director of E.ON, in Madrid
> assured that after the conversations with Endesa, he did **not
> expect to encounter any "obstacles," in allusion to the
> directors of the electrical company**.

121.    Further, in a conference call between CEO Bernotat and several analysts

held on the same day that the E.ON bid was announced, Bernotat stated:

> And therefore we are pretty sure that **we are operating on
> a friendly basis with the Endesa management**.  And the
> talks we have had were very friendly and professional.

122.    On February 26, 2006 the Spanish newspaper *El País* quoted E.ON CEO

Bernotat as stating:

33

> Between December and February, Miranda and the upper
> echelon of E.ON **"studied and explored"** several
> possibilities, the president of the German group, Wulf
> Bernotat has disclosed. . . . The two companies **studied
> the possibility** of a collaboration and explored how good a
> match they made from **a strategic and management point
> of view** ...

123.    These statements by E.ON's CEO suggest that E.ON and Endesa had

negotiated the essential terms of E.ON's competing bid, and either explicitly or impliedly

agreed that Endesa management would support that offer. As E.ON's CEO stated, E.ON

was admittedly "operating on a friendly basis with Endesa management," clearly to reach

an agreement concerning E.ON's bid.

124.    *Second*, upon information and belief, E.ON and Endesa have also reached

agreement to consult each other and act together in an effort to ensure the success of

E.ON's bid. For example, when the Spanish Energy Commission ("CNE") approved

E.ON's offer on July 27, 2006, but subjected that offer to a number of conditions, E.ON

and Endesa worked together in an effort to lift those conditions. On August 7, 2006,

Endesa's Board of Directors announced that it had unanimously resolved to appeal the

CNE's imposition of conditions. On August 11, 2006, E.ON notified the CNMV that

E.ON, likewise, had appealed the decision of the CNE to the Spanish Ministry of

Industry, Tourism and Commerce. E.ON's formal or informal agreement with Endesa

and its joint efforts pursuant to that agreement have not been disclosed in E.ON's

Schedule TO because the joint effort between E.ON and Endesa is in violation of Spanish

law.

125.    *Third*, on information and belief, E.ON and Endesa have entered into a

formal or informal agreement under which E.ON has agreed to permit Endesa's senior

management and Endesa's board of directors to retain their positions, and Endesa's management signaled to E.ON the price at which Endesa would recommend the offer to its shareholders.

126.    E.ON's Schedule TO states that Endesa's management will retain their positions if E.ON acquires Endesa and that current Endesa board members would remain on the board. E.ON Schedule TO at 29.

127.    The fact that Endesa and E.ON agreed on the price at which Endesa management would continue to support the E.ON offer is evidenced by the manner and timing of E.ON's increase of its original offer.

128.    As discussed above, E.ON's original offer for Endesa was made on February 21, 2006 and offered €27.50 per share. This was later reduced to €25.405 share because of a dividend paid by Endesa to its shareholders.

129.    On or about September 25, 2006 Acciona acquired a 10% stake in Endesa. The market price of Endesa shares on September 25, 2006 was €29.45.

130.    On September 26, 2006, E.ON announced that when Spanish law permitted, it would raise its bid to €35 per share. No competing bid for Endesa was made between the time that E.ON made its original €27.50 bid (reduced to €25.405) and E.ON's decision to raise its bid -- by 43% -- to €35 per share.

131.    During that time period, E.ON and Endesa met, under the protection of the confidentiality agreement, approximately 24 times. Upon information and belief, during those meetings E.ON and Endesa entered into a formal or informal agreement that caused E.ON to raise its bid in exchange for the continued support of Endesa management.

## SCIENTER ALLEGATIONS

132.   E.ON has actual knowledge that:  (i) its statement that its offer is based on public information is false and misleading; and (ii) E.ON is in possession of material non-public information regarding Endesa that it must disclose or cause Endesa to disclose as part of its tender offer.

133.   E.ON and Endesa have had significant, high-level contacts from September 2005 to the present, including eight separate meetings or conference calls between the CEOs of E.ON and Endesa; E.ON and Endesa have exchanged a significant volume of information about Endesa during these meetings, calls, and other contacts; since January, 2006, E.ON and Endesa have exchanged information pursuant to a confidentiality agreement; E.ON's management stated that it was through this process that it received the "information [it] needed" to make its tender offer; E.ON's CEO stated explicitly that E.ON had discussions with Endesa's management regarding Endesa's future plans through 2009 that went beyond publicly available information; E.ON's management made other statements about Endesa that appeared not to be based on publicly-available information; and E.ON's tender offers for Endesa shares included a significant premium above the prevailing market value of Endesa shares before the beginning of the tender offer process.

134.   Based on all of these facts, E.ON has actual knowledge that it was in possession of material, non-public information such that its statement that its offer is based on public information is false and misleading and that its Schedule TO is false and misleading by omitting to state the material, non-public information on which its offer is based.

135.   E.ON also has actual knowledge of the agreements E.ON has reached with Endesa and therefore has actual knowledge that the statement in the Schedule TO that E.ON and Endesa have not reached any material agreements other than the confidentiality agreement is false and misleading.

136.   E.ON also has actual knowledge of the allegations that Gas Natural has made in the Barcelona Litigation and therefore has actual knowledge that the mischaracterization of those allegations and their possible consequences in the Schedule TO is false and misleading.

## COUNT I – VIOLATION OF 15 U.S.C. §78n

137.   Gas Natural repeats and realleges the allegations set forth in Paragraphs 1 through 137 of this Complaint as if fully set forth herein.

138.   Section 14(d) of the Exchange Act, 15 U.S.C. §78n(d) and the rules and regulations promulgated thereunder, 17 C.F.R. §240.14d-1, *et seq.,* requires any person who makes a tender offer to disclose detailed information about itself and the background to the proposed transaction.

139.   The primary purpose of Section 14(d) is to insure that shareholders confronted with a tender offer are provided with sufficient information about the transaction to make an informed decision whether to tender their shares.

140.   Section 14(e) of the Securities Exchange Act provides that "it shall be unlawful for any person to make any untrue statement of material fact or omit to state any material fact in order to make the statements made, in the light of the circumstances under which they are made, not misleading."

141.   E.ON's Schedule TO is false and misleading in describing the E.ON offer

37

as based on "limited" diligence and "public" information. In truth, E.ON based its offer on material non-public information that it received in the dozens of meetings between senior executives of E.ON and Endesa and that it received from Deutsche Bank.

142.   E.ON knew or should have known of its duty to disclose these facts and that its omission to do so made its Schedule TO false and misleading.

143.   E.ON's misstatements and omissions are material because there is a substantial likelihood that Endesa shareholders would consider the omitted facts significant in making a decision as to whether to tender shares into E.ON's forthcoming offer.

144.   If E.ON is permitted to proceed with its offer on the basis of the false and misleading Schedule TO, Gas Natural and Endesa shareholders will be irreparably injured because they will be forced to respond to E.ON's offer for Endesa shares without having access to the same information that E.ON obtained as a result of its extensive contacts with Endesa's management.

## COUNT II – VIOLATION OF 15 U.S.C. §78n

145.   Gas Natural repeats and realleges the allegations set forth in Paragraphs 1 through 145 of this Complaint as if fully set forth herein.

146.   SEC regulations promulgated pursuant to Section 14(d) provide that material legal proceedings must be fairly and accurately disclosed in the context of a tender offer:

> (a) Agreements, regulatory requirements and legal proceedings. If material to a security holder's decision whether to sell, tender or hold the securities sought in the tender offer, furnish the following information:

> (5) Any material pending legal proceedings relating to the tender offer, including the name and location of the court or agency in which the proceedings are pending, the date instituted, the principal parties, and a brief summary of the proceedings and the relief sought.

17 C.F.R. § 229.1011.

147.    E.ON's Schedule TO is false and misleading in describing the Barcelona Litigation as an insignificant discovery proceeding. In truth, Gas Natural contends in the Barcelona Litigation that the communications between E.ON and Endesa violated Spanish law. There is a real and substantial risk that the Court in the Barcelona Litigation will declare E.ON's offer null and void as a result of the Spanish law violations. This risk, which goes to the likelihood that E.ON will be able to consummate its offer, should be clearly and thoroughly disclosed to U.S. shareholders.

148.    E.ON knew or should have known of its duty to disclose these facts and that its omission to do so made its Schedule TO false and misleading.

149.    E.ON's misstatements and omissions are material because there is a substantial likelihood that Endesa shareholders would consider the omitted facts significant in making a decision as to whether to tender shares into E.ON's forthcoming offer.

150.    If E.ON is permitted to proceed with its offer on the basis of the false and misleading Schedule TO, Gas Natural and Endesa shareholders will be irreparably injured because they will be forced to respond to E.ON's offer for Endesa shares without having access to the same information that E.ON obtained as a result of its extensive contacts with Endesa's management.

## COUNT III – VIOLATION OF 15 U.S.C. §78n

151.    Gas Natural repeats and realleges the allegations set forth in Paragraphs 1 through 151 of this Complaint as if fully set forth herein.

152.    SEC regulations promulgated pursuant to Section 14(d) provide that in the tender offer context, all agreements between the bidder and the target's management must be disclosed to shareholders:

> (d) *Subject company negotiations.* If the filing person is the subject company:
>
>> (1) State whether or not that person is undertaking or engaged in any negotiations in response to the tender offer that relate to:
>>
>>> (i) A tender offer or other acquisition of the subject company's securities by the filing person, any of its subsidiaries, or any other person; or
>>>
>>> (ii) Any of the matters referred to in paragraphs (c)(1) through (c)(3) of this section; and
>>
>> (2) Describe any transaction, board resolution, agreement in principle, or signed contract that is entered into in response to the tender offer that relates to one or more of the matters referred to in paragraph (d)(1) of this section.

17 C.F.R. § 229.1016.

153.    E.ON's Schedule TO is false and misleading in stating that there are no agreements between E.ON and Endesa relating to the offer.  E.ON's public statements indicate that it has reached agreement with Endesa to maintain Endesa management and as to the price at which Endesa management would support E.ON's offer.

154.    E.ON knew or should have known of its duty to disclose these facts and that its omission to do so made its Schedule TO false and misleading.

155.    E.ON's misstatements and omissions are material because there is a substantial likelihood that Endesa shareholders would consider the omitted facts significant in making a decision as to whether to tender shares into E.ON's forthcoming offer.

156.    If E.ON is permitted to proceed with its offer on the basis of the false and misleading Schedule TO, Gas Natural and Endesa shareholders will be irreparably injured because they will be forced to respond to E.ON's offer for Endesa shares without having access to the same information that E.ON obtained as a result of its extensive contacts with Endesa's management.

## PRAYER FOR RELIEF

WHEREFORE, Gas Natural requests that this Court issue an order:

(i)     Declaring that the "informational" Schedule TO filed by E.ON is false and misleading;

(ii)     Directing E.ON to make full and complete corrective disclosure setting forth the non-public information on which its forthcoming offer is based;

(iii)     Directing E.ON to make full and complete corrective disclosure of any and all agreements that E.ON has reached with Endesa;

(iv)     Directing E.ON to make full and complete corrective disclosure regarding the claims in the Barcelona Litigation and the real and substantial risk that the Barcelona Court will declare E.ON's tender offer null and void as a result of E.ON's violations of Spanish law;

(v)     Enjoining E.ON from taking further steps to consummate its U.S. tender offer and from purchasing shares of Endesa from U.S. holders until E.ON has complied with the Court's direction and has made full and complete corrective disclosures;

(vi)     Enjoining E.ON from in the future making false and misleading disclosures regarding its tender offer for Endesa; and

(vii)   Such other relief as the Court deems just and
proper.

Dated: November 30, 2006

Respectfully submitted,

By: _____

Simpson Thacher & Bartlett LLP
Mark G. Cunha (MC 1189)
James Gamble (JG 6286)
David Elbaum (DE 5132)
425 Lexington Avenue
New York, NY 10017-3954

Telephone: (212) 455-2000
Facsimile:  (212) 455-2502
E-mail:mcunha@stblaw.com
        jgamble@stblaw.com
        delbaum@stblaw.com

Attorneys for Gas Natural SDG, S.A.