UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
GAS NATURAL,                            :
                         Plaintiff,     :
                                        :   06 Civ. 13607 (DLC)
              -v-                       :
                                        :   OPINION AND ORDER
E.ON AG, E.ON ZWÖLFTE VERWALTUNGS GmbH  :
and BKB AG,                             :
                        Defendants.     :
                                        :
----------------------------------------X

Appearances:

For Plaintiff:
Mark G. Cunha
James Gamble
David Elbaum
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY  10017-3954

For Defendants:
Rory O. Millson
Rowan D. Wilson
Gary A. Bornstein
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY  10019


DENISE COTE, District Judge:

     This Opinion addresses whether a prospective tender offeror

is obligated to disclose material nonpublic information under

Section 14(d), 15 U.S.C. § 78(n)(d) ("Section 14(d)"), and

Section 14(e), 15 U.S.C. § 78(n)(e) ("Section 14(e)"), of the

Securities Exchange Act of 1934 ("Exchange Act") in its filings

with the Securities and Exchange Commission ("SEC") that precede

the commencement of a tender offer.  Under the circumstances
that prevail here, the answer is no.

This litigation arises in the context of a battle between
European companies for control of Spain's largest electrical
utility, Endesa, S.A. ("Endesa"), a company whose shares are
traded in the United States as American Depository Shares
("ADSs").[1]  Plaintiff Gas Natural, a Spanish company engaged in
the business of distributing natural gas, electricity and
energy-related products and services, has announced its
intention to make a tender offer for Endesa.  Defendants E.ON AG
and E.ON Zwölfte Verwaltungs GmbH (collectively "E.ON") are
German power and gas companies which have publicly announced a
competing tender offer for Endesa.

Pursuant to Section 14(d), E.ON has filed with the SEC and
served on Endesa approximately thirty-five statements known as a
Schedule TO-C which include as exhibits written communications
regarding its proposed tender offer.  The complaint asserts
three claims for injunctive relief under both Sections 14(d) and

---

[1] In order for a foreign corporation to trade on an American
stock exchange, the foreign corporation must issue and deposit
American Depository Shares ("ADSs") with an American financial
institution.  E.ON AG, v. Acciona, S.A, No. 06 Civ. 8720 (DLC),
2006 WL 3357261, *1 n.2 (S.D.N.Y. Nov. 20, 2006).  The
depository institution then issues American Depository Receipts
("ADRs") to the beneficial owners of the ADSs, who may sell the
ADSs on American securities exchanges.  Id.  The ADR system is
the means by which American investors hold and trade equity
interests in foreign companies.  Id.

14(e), alleging that E.ON's Section 14(d) filings contain material misstatements and omissions.  Plaintiff seeks declaratory relief stating that the Schedule TO-C filed by E.ON on November 17, 2006 is false and misleading, and injunctive relief in the form of an order (1) directing E.ON to make full and complete corrective disclosures; (2) prohibiting E.ON from taking further steps to consummate its U.S. tender offer and from purchasing Endesa shares from U.S. holders pending corrective disclosure, and (3) prohibiting E.ON from making future false and misleading disclosures.

Concurrently with the filing of the papers associated with a motion by the plaintiff for a preliminary injunction, defendants moved to dismiss the complaint for its failure to state a claim.  This Opinion grants in part that motion to dismiss.

BACKGROUND

The battle for control of Endesa has already been described in this Court's recent Opinion in a related case: E.ON AG, v. Acciona, S.A., No. 06 Civ. 8720 (DLC), 2006 WL 3357261 (S.D.N.Y. Nov. 20, 2006).  The following facts are drawn from the

complaint in the instant lawsuit and relevant text is quoted directly from E.ON's November 17, 2006 Schedule TO-C.[2]

A. Gas Natural and E.ON Bids for Endesa

On September 5, 2005, Gas Natural announced its intention to acquire 100% of the outstanding ordinary shares and ADSs of Endesa at €21.30 per share with a combination of cash and stock. Endesa's management immediately opposed Gas Natural's offer and sought bids from other energy companies.  Endesa solicited E.ON to acquire 24% of its shares, the maximum amount permissible under Spanish law without making a formal tender offer. Instead, on February 21, 2006, E.ON announced its intention to launch a competing tender offer for all of Endesa's outstanding shares and ADSs for €27.50 per share in cash, a total offer of €29.1 billion.

Following the E.ON announcement, Gas Natural continued its pursuit of a tender offer.  It filed its formal bid for Endesa with the Spanish securities regulator, the Comisión Nacional del Mercado de Valores ("CNMV"), on February 27, 2006, which the CNMV approved.  On March 6, the SEC declared effective Gas Natural's Registration Statement for the shares it would issue in the U.S. offer.  On the same day, Gas Natural filed with the

---

[2] The differences among the various Schedules TO are explained <u>infra</u>.

SEC a Schedule TO announcing its intention to launch a tender offer in the United States to acquire all of the outstanding Endesa shares held by U.S. persons.

B. Litigation

Since the Spring, this take-over battle has generated extensive litigation, principally but not exclusively in Spain. Endesa has filed fourteen separate legal actions in the courts of Spain, the European Union, and the United States, seeking to block Gas Natural's offer.  On March 21, a Commercial Court in Madrid enjoined Gas Natural from proceeding with its bid pending a decision on an antitrust claim filed by Endesa.  Endesa appealed the CNMV's approval of Gas Natural's bid to the Spanish Supreme Court, which, on April 28, temporarily suspended the CNMV's approval until it could rule on the merits of Endesa's claim.  As a result of these two injunctions, E.ON's tender offer is also enjoined under Spanish law.  Meanwhile, on July 27, E.ON announced its intention to increase its offer for Endesa to €35 per share upon approval by the CNMV.

Gas Natural has also resorted to litigation, not just through the filing of the instant lawsuit, but also in Spain. In July and September 2006, Gas Natural requested that a Barcelona Court take "preliminary measures" with regard to its complaint that Endesa, E.ON, and Deutsche Bank (who was a

financial advisor to Endesa on the Gas Natural bid and also served as E.ON's "mandated lead arranger" on its bid for Endesa) had engaged in unfair competition ("Barcelona Litigation").  On October 25, the Barcelona Court granted Gas Natural's request for "preliminary measures" and ordered E.ON, Deutsche Bank, and Endesa to provide the court with documents.

C. CNMV Approval of E.ON's Bid and the Spanish Sealed Bid Process

On November 16, the CNMV approved E.ON's bid for Endesa. The next day, Endesa publicly announced its intention to request that the injunctions imposed by the Madrid court and the Spanish Supreme Court against Gas Natural's bid be lifted.  On November 17, E.ON issued a press release announcing both developments.

Under Spanish law, once the injunctions on Gas Natural's bid are lifted, the CNMV will issue a notice permitting Gas Natural and E.ON to submit final, sealed bids for Endesa's shares.  Within five days from the date of the CNMV's request, Gas Natural and E.ON will have only one opportunity to submit their final, sealed bids.  If there is more than one sealed bid, the CNMV will announce the winner of the sealed bids the following day.  The winner will then be permitted formally to commence its tender offer in Spain and acquire Endesa shares.

D. E.ON's November 17 Schedule TO-C

On November 17, 2006, E.ON filed a Schedule TO-C ("E.ON TO-C") with the SEC, which included two exhibits: the November 17 press release ("Pres Release") and a Preliminary U.S. Offer to Purchase ("Preliminary Offer").  The E.ON TO-C, which consists of four pages exclusive of the exhibits, indicates in several locations that it is a preliminary communication rather than a formal tender offer filing.  Its cover page identifies the document as an "SC TO-C."  On the second page, E.ON checked the box next to the statement, "Check the box if the filing relates solely to preliminary communications made before the commencement of a tender offer."  At the top of this second page, E.ON also included the following statement highlighted with an asterix: "Pursuant to General Instruction D to Schedule TO, no filing fee is required because this filing contains <u>only preliminary communications made before the commencement of a tender offer</u>." (emphasis added).  E.ON further clarifies on page three that the filing does not contain the mechanism by which Endesa security holders may actually tender their shares.

> The exhibit (a)(5)(DDD) attached hereto is a preliminary U.S. offer to purchase (the "Preliminary Offer to Purchase") that relates solely to the U.S. Offer and is for informational purposes only.  **<u>The Preliminary Offer to Purchase does not include the means for holders of Endesa securities to tender their Endesa securities into the U.S. Offer.  Neither the Share Form of Acceptance nor the ADS Letter of Transmittal referred to in the Preliminary Offer</u>**

<u>**to Purchase may be obtained from the Information Agent or any other person**</u>.

(Emphasis in original).

Similarly, both exhibits to the E.ON TO-C indicate that they are not offers for securities.  They also inform Endesa security holders how they will be able to obtain key future filings in Spain and the United States relating to E.ON's upcoming tender offer, and urge shareholders to read these documents when they become available.

The two-page Press Release responds to Endesa's decision to request Spanish courts to lift their injunctions against Gas Natural's offer and expresses confidence that E.ON's competing bid will be successful.  It includes the following message on its second page:

> This press release does not constitute an invitation to sell or an offer to buy any securities or a solicitation of any vote or approval.  <u>Endesa investors and security holders are urged to read the prospectus and U.S. tender offer statement from E.ON regarding the proposed tender offer for Endesa when they become available, because they will contain important information.</u>  The prospectus and certain complementary documentation will be filed in Spain with the Spanish Comisión Nacional del Mercado de Valores (the "CNMV").  Likewise, a U.S. tender offer statement will be filed in the United States with the U.S. Securities and Exchange Commission (the "SEC").  Investors and security holders may obtain a free copy of the prospectus (when it is available) and its complementary documentation from E.ON, Endesa, the four Spanish Stock Exchanges, and Santander Investment Bolsa SV SA or Santander Investment SA, CorE.ONores de Bolsa [sic].  The prospectus will also be available on the websites of the CNMV (www.cnmv.es) and E.ON (www.eon.com).  Likewise, investors and security holders may obtain a free copy of the U.S. tender offer

statement (when it is available) and other documents filed
by E.ON with the SEC on the SEC's web site at www.sec.gov.
The U.S. tender offer statement and these other documents
may also be obtained for free from E.ON, when they become
available, by directing a request to E.ON AG, External
Communications, Tel.: 0211-45 79-4 53.

(Emphasis supplied).

The Preliminary Offer, which is the second exhibit to the

E.ON TO-C, is a seventy-one page document that provides many of

the categories of information that must be included in a

Schedule TO-T.  Although it appears to follow the format of a

Schedule, it prominently features a legend which indicates that

it is a preliminary and not a final offer.  Its first page

begins with the bolded statement:

> **This preliminary Offer to Purchase does not include the
> means for holders of Endesa securities to tender their
> Endesa securities into the U.S. Offer.  Neither the Share
> Form of Acceptance nor the ADS Letter of Transmittal
> referred to in this preliminary Offer to Purchase may be
> obtained from the Information Agent or any other person.**

This preliminary Offer to Purchase does not constitute an
invitation to sell or an offer to buy any securities or a
solicitation of any vote or approval and this preliminary
Offer to Purchase cannot be used to tender any Endesa
securities.  Endesa investors and security holders are
urged to read the Spanish prospectus and the definitive
U.S. tender offer statement from E.ON regarding the
proposed tender offer for Endesa when they become
available, because they will contain important information.

(Emphasis in original).

Several of the disclosures in the E.ON TO-C are relevant to

the allegations in the complaint.  The Preliminary Offer

includes detailed disclosure regarding E.ON's contacts with

Endesa preceding and following announcement of its intention to launch a tender offer for the company.  Section 14 of the document begins with the following statement:

> On September 3, 2005, Gas Natural filed an offer document with the CNMV for approval and announced its intent to commence a tender offer for all the capital stock of Endesa.  Since then, E.ON and Endesa have had a number of contacts to discuss possible courses of action with respect to Gas Natural's tender offer.  E.ON and Endesa entered into a confidentiality agreement on January 16, 2006, and, on the basis of that confidentiality agreement, E.ON has conducted a limited due diligence review of operational, financial and legal matters regarding Endesa.  <u>Except for the confidentiality agreement referred to above, neither E.ON nor E.ON 12 have reached any agreement with Endesa</u>, the members of the board of directors of Endesa or any shareholder of Endesa in connection with the Offers.

(Emphasis supplied).

Directly following this description, the document lists over thirty contacts between September 2005 and August 21, 2006 involving E.ON and Endesa executives, including their CEOs and legal counsel.  E.ON highlighted contacts with Endesa representatives in the period immediately preceding its February 21, 2006 filing of an offer document for Endesa shares with the CNMV.

> In the period immediately before the announcement of E.ON's offer for Endesa, several telephone conversations took place between Dr. Bernotat, Mr. Miranda, or almost on a daily basis, other representatives of E.ON and Endesa.

E.ON also reported that representatives of both companies met fourteen times between March 17, 2006 and November 6, 2006 "in

order to further discuss the Offer including, on several
occasions, the implications" of a decree which required E.ON to
file with the CNMV an application for authorization of its
Spanish Offer.  The Preliminary Offer also disclaims
responsibility for the accuracy of Endesa's publicly reported
information:

> This Offer to Purchase includes information concerning
> Endesa that is based on publicly available information
> (primarily filings by Endesa with the SEC and the CNMV).
> Publicly available information concerning Endesa may
> contain errors.  E.ON and E.ON 12 cannot take
> responsibility for the accuracy or completeness of the
> information contained in such public information, or for
> any failure by Endesa to disclose events which may have
> occurred or may affect the significance or accuracy of any
> such information but which are unknown to E.ON and E.ON 12.
> E.ON conducted only limited due diligence review of Endesa,
> as described in Section 14 ("Background of the Offers;
> Contacts with Endesa") of this Offer to Purchase, and E.ON
> and E.ON 12 have no knowledge that would indicate that any
> statement relating to Endesa contained in this Offer to
> Purchase is inaccurate or incomplete.

(Emphasis supplied).

In Section 14 of the Preliminary Offer, E.ON communicates
to Endesa security holders its intentions regarding Endesa
should it succeed in its bid.

> E.ON 12's Offers a,re [sic] not being made for the purpose
> of generating synergies.  E.ON believes that the
> acquisition of Endesa will be profitable whether or not
> there are specific cost savings, that are realized as a
> result of the acquisition of Endesa.  As of the date of
> this Offer to Purchase, E.ON 12 is unable to quantify
> synergies or costs savings, if any, resulting from the
> acquisition of Endesa.

The Preliminary Offer additionally reports E.ON's plan to
continue Endesa's investment strategy to keep "certain Spanish
'strategic assets' that are wholly or partially owned by Endesa
. . . operative."  These "strategic assets" include a pipeline
from Algeria to Spain, nuclear power plants and coal fired power
plants.  Finally, the Preliminary Offer describes E.ON's
intentions with regard to Endesa employees and management as
follows:

> E.ON does not plan any material change in connection with
> the employees or the management team of Endesa as a result
> of the Offers, except for the potential changes in Endesa's
> governing bodies as described below.  In particular, E.ON
> has no plans to reduce the employment levels of the
> companies in the Endesa group.  E.ON may install certain
> engagement programs for key managers and a long term
> incentive program.  Endesa is expected to maintain its
> registered office and its board of directors in Spain.

Section 18 of the Preliminary Offer discloses information
regarding legal matters related to E.ON's tender offer,
including required antitrust and other regulatory approvals in
several countries.  E.ON reports to Endesa security holders
details of the Barcelona Litigation in this section.

> On July 28, 2006, Gas Natural filed a pre-trial
> proceeding request with the Court for Business Matters No.
> 1 in Barcelona (Juzgado de lo Mercantil n°1 de Barcelona)
> based on the Spanish Unfair Competition Law requesting
> Endesa, E.ON, HSBC Bank plc, Citigroup Global Markets
> Limited, J.P. Morgan plc and Deutsche Bank AG (which are
> referred to as the "Requested Parties") to furnish certain
> information and documents on the contacts maintained
> amongst them in connection with the Spanish Offer.  On
> October 25, 2006, the Court for Business Matters No. 1 in
> Barcelona ordered the Requested Parties to provide copies

12

of certain documents relating to the Spanish Offer within
15 days as from [sic] the notification of such decision.
The requested documents, relating to the Spanish Offer,
include, but are not limited to, the confidentiality
agreements entered into by the Requested Parties, Board
minutes, minutes of meetings, the agreements and mandate
letters among Endesa, E.ON and their respective advisors,
due diligence reports, and copies of all mailings amongst
the Requested Parties.  After the requested documents are
furnished, the Court for Business Matters No. 1 in
Barcelona will decide which of such documents shall be
provided to Gas Natural.  This decission [sic] will depend
on the eventual relevance of such document [sic] to serve
as a basis for a possible future lawsuit.

The request for pre-trial proceedings does not imply
the initiation of further jurisdictional proceedings
against the Requested Parties.  It is a pre-trial activity
only, which purpose is to furnish the requesting party with
the sufficient information to decide whether or not to file
a lawsuit.  No request for precautionary measures has been
filed.  As of the date hereof, only Endesa has appeared in
pre-trial proceedings, being the rest of the Requested
Parties, including E.ON pending to be notified [sic].

(Emphasis supplied).


E. Gas Natural Files Suit in the Southern District of New York.

On November 30, 2006, Gas Natural filed the instant

complaint alleging that E.ON's Schedule TO-C is false and

misleading in violation of Sections 14(d) and 14(e) of the

Exchange Act in three respects: 1) its description of the E.ON

offer as based on "limited" diligence and "public" information;

2) its description of the Barcelona Litigation, and 3) its

failure to disclose agreements between E.ON and Endesa relating

to the E.ON tender offer, including agreements as to the

retention of Endesa management and the price at which Endesa management would support the E.ON offer.

On December 1, Gas Natural brought by order to show cause motions for expedited discovery as to E.ON and third party Deutsche Bank and a motion for a preliminary injunction against E.ON.  Following a conference with the parties, a schedule was reached for preliminary injunction proceedings, including a hearing to be held on December 20.

E.ON moved to dismiss Gas Natural's action for failure to state a claim on December 11.  This motion was fully submitted on December 18, and it is this motion which is addressed in this Opinion.


DISCUSSION

Under the pleading standard set forth in Rule 8(a) of the Federal Rules of Civil Procedure, complaints must include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "[A] plaintiff is required only to give fair notice of what the claim is and the grounds upon which it rests."  Leibowitz v. Cornell Univ., 445 F.3d 586, 591 (2d Cir. 2006).  "[A] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" set forth therein.  Swierkiewicz v. Sorema N.A.,

534 U.S. 506, 514 (2002) (citation omitted); see also Twombly v. Bell Atl. Corp., 425 F.3d 99, 106 (2d Cir. 2005).  For purposes of a motion to dismiss, the court may consider public disclosure documents required by law to be, and that have been, filed with the SEC.  Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000).

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  Rule 9(b) applies to securities law claims to the extent these "claims are premised on allegations of fraud."  Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004) (finding that Rule 9(b) applied to Sections 11 and 12(a)(2) claims under the Securities Act of 1933).  Rule 9(b) requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006). Under Rule 9(b) "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).  Nonetheless, "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." Lerner, 459 F.3d at 290 (citation omitted).  "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and

opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Id. at 290-91 (citation omitted). In securities fraud actions, the requirements of Rule 9(b) are applied "assiduiously." Lentell v. Merill Lynch & Co. Inc., 396 F.3d 161, 168 (2d Cir. 2005).

Similarly, the PSLRA requires that any "securities fraud" claims brought under the Exchange Act "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78(u)-4(b)(1). See Rombach, 355 F.3d at 170. "[N]o claim should be filed unless and until it can be supported by specific factual allegations." Lentell, 396 F.3d at 168.

The heightened pleading standards of Rule 9(b), Fed. R. Civ. P., and the PSLRA apply to claims brought under Section 14(e). See In re Digital Island Sec. Litig., 357 F.3d 322, 328-29 (3d Cir. 2004) (applying PSLRA pleading standard to Section 14(e) claim); Brody v. Transitional Hosp. Corp., 280 F.3d 997, 1006 (9th Cir. 2002) (same); Conn. Nat'l Bank v. Fluor Corp., 808 F.2d 957, 962 (2d Cir. 1987) (applying Rule 9(b) to Section 14(e) claim). To the extent a Section 14(d) claim is "premised

on allegations of fraud," <u>Rombach</u>, 355 F.3d at 171, it will also be subject at the very least to Rule 9(b)'s criteria.[3]

When considering a motion to dismiss, a trial court "must accept as true all the factual allegations in the complaint and draw all reasonable inferences in [the] plaintiff['s] favor." <u>In re Tamoxifen Citrate Antitrust Litig.</u>, 466 F.3d 187, 200 (2d Cir. 2006) (citation omitted).  The court's duty "is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient."  <u>Chosun Int'l, Inc. v. Chrisha Creations, Ltd.</u>, 413 F.3d 324, 327 (2d Cir. 2005) (citation omitted).


A. The Williams Act

Sections 14(d) and 14(e) were enacted as part of the 1968 Williams Act amendments ("Act") to the Exchange Act.  The Williams Act regulates tender offers with "the 'twin aims' of, first, maintaining neutrality between bidders and target companies and, second, protecting target shareholders by requiring that bidders make certain disclosures."  <u>Billing v. Credit Suisse First Boston Ltd.</u>, 426 F.3d 130, 158 (2d Cir. 2005) (citation omitted).  The Act created disclosure requirements in Section 14(d) and included an antifraud

---

[3] It is unnecessary to reach whether the PSLRA's requirements apply to a Section 14(d) claim premised on fraud.

provision in Section 14(e).  Id.  Through the Act, Congress
attempted "to make disclosure, rather than court imposed
principles of fairness or artificiality, the preferred method of
market regulation."  United States v. O'Hagan, 521 U.S. 642, 668
(1997) (citation omitted).


B. Section 14(d)

Section 14(d)(1) requires those making a tender offer for
certain regulated securities to disclose publicly information
related to the tender offer.  17 C.F.R. § 78(n)(d)(1).  This
provision and its related rules prohibit any person from making
a tender offer unless the person simultaneously files with the
SEC and sends to the target company a statement now known as a
Schedule TO.  17 C.F.R. § 240.14-100.

Section 14(d)(1) states in pertinent part:

> It shall be unlawful for any person, directly or
> indirectly, by use of the mails or by any instrumentality
> of interstate commerce or of any facility of a national
> securities exchange or otherwise, to make a tender offer
> for, or a request or invitation for tenders of, any class
> of any equity security which is registered pursuant to
> section 78l of this title . . . , if, after consummation
> thereof, such person would, directly or indirectly, be the
> beneficial owner of more than 5 per centum of such class,
> unless at the time copies of the offer or request or
> invitation are first published or sent or given to security
> holders such person has filed with the Commission a
> statement containing such information specified in section
> 78m(d) of this title, and such additional information as
> the Commission may by rules and regulations prescribe as
> necessary or appropriate in the public interest or for the
> protection of investors.  All requests or invitations for

18

> tenders or advertisements making a tender offer or
> requesting or inviting tenders of such a security shall be
> filed as a part of such statement and shall contain such of
> the information contained in such statement as the
> Commission may by rules and regulations prescribe.

15 U.S.C. § 78(n)(d)(1) (emphasis added).  Section 14(d)(1)

further requires filers to provide "[c]opies of all statements,

in the form in which such material is furnished to security

holders and the Commission" directly to the issuer no later than

the date the material is first published or sent or given to any

security holder.  Id.


C. Overview of the Year 2000 Rule Revisions[4]

        Effective January 24, 2000, the SEC enacted a sweeping and

comprehensive revision to Regulation 14D[5] and other rules

affecting tender offers, mergers, acquisitions and similar

extraordinary transactions.  In the words of the SEC, this

massive revision was "prompted by an increase in the number of

transactions where securities are offered as consideration; an

increase in the number of hostile transactions involving proxy

and consent solicitations; and significant technological

---

[4] This Opinion describes only those revisions that pertain to the
issues raised by E.ON's motion to dismiss.

[5] Regulation 14D consists of Rules 14d-1 through 14d-101, 17
C.F.R. §§ 240.14d-1 through 240.14d-101, and "shall apply to any
tender offer which is subject to section 14(d)(1) of the
[Exchange] Act . . . ."  17 C.F.R. § 240.14d-1.

advances that have resulted in more and faster communications
with security holders and the markets."  Regulation of Takeovers
and Security Holder Communications, Securities Act Release No.
7760, Exchange Act Release No. 42055, Investment Company Act
Release No. 24107, 70 S.E.C. Docket 2229, 1999 WL 969596, at *3
(Oct. 22, 1999) (hereinafter "Final Release").

     With respect to tender offers, the revisions relaxed the
restrictions in the prior regulatory scheme on oral and written
communications with security holders "by permitting the
dissemination of more information on a timely basis, so long as
the written communications are filed on the date of first use."
Id. at *4.  Thus, more communications regarding a proposed
tender offer are permitted without those communications being
deemed a "commencement" of an offer, and subject to the filing
and disclosure rules that accompany a commencement.  Id.  As
described by the Seventh Circuit, "the new rules substantially
eliminate existing restrictions on pre-commencement
communications."  Hartmarx Corp. v. Abboud, 326 F.3d 862, 867
(7th Cir. 2003).

     With these revisions, the SEC also created a new document
for filing tender offer disclosures, the Schedule TO.  17 C.F.R.
§ 240.14d-100.  The new schedule combined the forms for
disclosures by issuers and third-parties making tender offers,
formerly known as Schedules 13E-4 and 14D-1, into one schedule.

Final Release, at *4, *25.  To describe in detail the material
which must be included in this new schedule, and to "simplify
and integrate" the disclosure requirements for tender offers,
the SEC created a new series of rules within existing Regulation
S-K called Regulation M-A.  Id. at *4, *24; 17 C.F.R. §
229.1000-1016.  Each of the items listed in the Schedule TO
corresponds to a provision in Regulation M-A.

On the effective day of the amendments, the SEC revised its
forms on its electronic filing system known as EDGAR.  Adoption
of Updated EDGAR Filer Manual, Securities Act Release No. 7789,
Exchange Act Release No. 42327, 71 S.E.C. Docket 1013, 2000 WL
16940 (Jan. 11, 2000) (hereinafter, "EDGAR Release").  The new
forms included a Schedule TO-T, the "[t]ender offer schedule".
Id. at *1.  It added a Schedule TO-T/A to be used for amendments
to a Schedule TO-T.  Id.  In addition, it created a form labeled
TO-C to be used for "[w]ritten communications relating to an
issuer or third party tender offer not by the subject company".
Id.


D. Tender Offer "Commencement"

Before the 2000 amendments to Regulation 14D, the "five
business day rule" limited communications regarding a proposed
tender offer between a tender offeror and others with the

holders of target company securities.[6]  See Field v. Trump, 850
F.2d 938, 943 (2d Cir. 1988) (describing five business day
rule).  The 2000 amendments to Regulation 14D eliminated the
five business day rule and redefined the concept of commencement
"to provide security holders with the broadest possible
disclosure of information at the earliest date possible."  Final
Release, at *18.

     The definition of commencement is contained in Rule 14d-2.
According to Rule 14d-2, "[a] bidder will have commenced its
tender offer for purposes of Section 14(d) of the Act (15 U.S.C.
§ 78(n)) and the rules under that section at 12:01 a.m. on the
date when the bidder has first published, sent or given the
means to tender to security holders."  17 C.F.R. § 240.14d-2(a)
(emphasis added).  The means to tender include the transmittal
form or a statement regarding how the transmittal form may be
obtained.  Id.  See Gerber v. Computer Assocs. Int'l, 303 F.3d
126, 133-35 (2d Cir. 2002) (describing "commencement" under pre-
2000 Rule 14d-2).

---

[6] The five business day rule deemed an offer to "commence" on the
public announcement of the identity of the bidder, the identity
of the subject company, the amount and class of securities
sought and the price or range of prices offered, unless a tender
offer statement was filed within five business days of the
announcement and disseminated to security holders, or the bidder
made a subsequent public announcement withdrawing the offer.
See Final Release, at *16 n.85.

In contrast, a communication by a bidder will <u>not</u> constitute commencement of a tender offer under Section 14(d) if a communication does not include the means to tender and if, in the case of a written communication, the written communication is filed under the cover of a Schedule TO.  Rule 14d-2(b) provides that

> [a] communication by the bidder will not be deemed to constitute commencement of a tender offer if:
>
> (1) <u>It does not include the means for security holders to tender their shares into the offer; and</u>
>
> (2) <u>All written communications relating to the tender offer</u>, from and including the first public announcement, <u>are filed under cover of Schedule TO</u> (§240.14d-100) with the Commission no later than the date of the communication. The bidder also must deliver to the subject company and any other bidder for the same class of securities the first communication relating to the transaction that is filed, or required to be filed, with the Commission.

17 C.F.R. § 240.14d-2(b) (emphasis added).  The SEC explains that the new definition of "commencement"

> establishes a uniform time at which a tender offer is deemed to commence, it continues to balance the rights and obligations of bidders and targets, and it <u>facilitates the free flow of information</u> from both bidders and targets before that date (subject to the antifraud provisions), based on our judgment that this flow of information is in the best interests of the holders of securities.  The elimination of the five business day rule and the other changes in the rule are intended to provide security holders with the broadest possible disclosure of information at the earliest date possible.

Final Release, at *18 (emphasis supplied).

The line between pre-commencement and commencement activities also defines the scope of a bidder's obligations under Regulations 14D and M-A.  Among other things, commencement triggers the duty to file a Schedule TO under Rule 14d-3, to disseminate information under Rule 14d-4, and to disclose information under Rule 14d-6(a).

Rule 14d-3 provides that with commencement a tender offeror must disclose the information required by the Schedule TO.  A bidder may not launch a tender offer,

> unless as soon as practicable on the date of commencement of the tender offer such bidder:
>> (1) Files with the Commission a Tender Offer Statement on Schedule TO (§240.14d-100), including all exhibits thereto:
>> (2) Delivers a copy of such Schedule TO, including all exhibits thereto:
>>> (i) To the subject company. . . ; and
>>> (ii) To any other bidder, which has filed a Schedule TO with the Commission relating to a tender offer which has not yet terminated for the same class of securities of the subject company . . . ;
>> (3) Gives telephonic notice of the information required by Rule 14d-6(e)(2)(i) and (ii) and mails by means of first class mail a copy of such Schedule TO, including all exhibits thereto:
>>> (i) To each national securities exchange where such class of the subject company's securities is registered and listed for trading . . .
>>> (ii) To the National Association of Securities Dealers, Inc.

17 C.F.R. § 240.14d-3(emphasis supplied).

Rule 14d-4 sets forth the tender offeror's duty to disseminate information to security holders "[a]s soon as

practicable on the date of commencement of a tender offer."  17
C.F.R. § 240.14d-4.  Rule 14d-6(a) details the information
tender offerors must disclose on and after the "date of
commencement."  17 C.F.R. § 240.14d-6(a).  Finally, as further
explained in Instruction D on the Schedule TO, a tender
offeror's obligation to disclose the specific information
required by Regulation M-A (in the form of answers to the items
listed in the Schedule TO-T) begins with "commencement" of a
tender offer.  17 C.F.R. § 240.14d-100, inst. D.

E. Regulation M-A

     Regulation M-A is divided into seventeen "Items," which
correspond to the items of required disclosure in a Schedule TO-
T.  The Items in Regulation M-A require disclosure of, among
other information, a summary term sheet (Item 1001) and
information about the (1) subject company (Item 1002); (2) the
identity and background of the filing person (Item 1003); (3)
the terms of the transaction (Item 1004); (4) past contacts,
transactions, negotiations, and agreements (Item 1005); (5) the
purpose of the transaction and plans or proposals (Item 1006);
(6) the source and amount of funds or other consideration (Item
1007); (7) interest in securities of the subject company (Item
1008); (8) persons/assets retained, employed, compensated or

used (Item 1009); and (9) financial statements (Item 1010).  17

C.F.R. § 229.1001-1010.

Three provisions have particular relevance to the

plaintiff's claims.  Item 1011(a)(1) provides that if it is

"material to a security holder's decision whether to sell,

tender or hold the securities sought in a tender offer," a

tender offeror is required to disclose

> [a]ny present or proposed material agreement, arrangement,
> understanding or relationship between offeror or any of its
> executive officers, directors, controlling persons or
> subsidiaries and the subject company or any of its
> executive officers, directors, controlling persons or
> subsidiaries (other than any agreement, arrangement or
> understanding disclosed under any other sections of
> Regulation M-A . . . ).

17 C.F.R. § 229.1011(a)(1) ("Item 1011(a)(1)") (emphasis

supplied).  Item 1011(a)(5) requires the disclosure of

> [a]ny material pending legal proceedings relating to the
> tender offer, including the name and location of the court
> or agency in which the proceedings are pending, the date
> instituted, the principal parties, and brief summary of the
> proceedings and the relief sought.

17 C.F.R. § 229.1011(a)(5) ("Item 1011(a)(5)") (emphasis

supplied).  The Instruction to Item 1011(a)(5) further requires

that the filer promptly furnish the SEC a copy of any document

relating to a major development in material legal proceedings,

such as pleadings, an answer, complaint, temporary restraining

order, injunction, opinion, judgment or order.  Id. at inst.

Finally, Item 1011(b) states the general requirement that the

filer "[f]urnish such additional material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading."  17 C.F.R. § 229.1011(b).


F. Pre-Commencement Communications

    Although bidders making pre-commencement communications about a tender offer are not required to file a Schedule TO-T containing the responses to the Items in Regulation M-A, they must still comply with Regulation 14D filing requirements.  On the day that they make any written communication relating to the tender offer, they must attach the communication to a version of Schedule TO known as the Schedule TO-C.

    According to Rule 14d-2(b)(2), "[a]ll written communications relating to the tender offer, from and including the first public announcement, are filed under cover of Schedule TO . . . no later than the date of the communication."  17 C.F.R. § 240.14d-2(b)(2).  A "public announcement" is defined as

> any oral or written communication by the bidder, or any
> person authorized to act on the bidder's behalf, that is
> reasonably designed to, or has the effect of, informing the
> public or security holders in general about the tender
> offer.

17 C.F.R. § 240.14d-2(b)(2), inst. 5.

    As explained in the EDGAR Release, the form for filing such a written communication is the Schedule TO-C.  EDGAR Release, at

*1.  A Schedule TO-C is identified as such by a check-marked box on its second page.  In addition, a prominent legend within each pre-commencement communication instructs readers to obtain and read final offer documents.  Thus, to identify the filing as a pre-commencement communication (and one that is not subject to the disclosure obligations of Regulation M-A), the "box on the front of Schedule TO indicating that the filing contains pre-commencement communications must be checked."  17 C.F.R. § 240.14d-2(b)(2), inst. 1.  In addition, the filing includes "a prominent legend in clear, plain language advising security holders to read the tender offer statement when it is available because it contains important information."  Id. at inst. 3.[7]

Accordingly, as Instruction D of Schedule TO explains, until a tender offer has formally commenced, there is no obligation to provide the information detailed in Regulation M-A.  Instruction D states:

> If the filing contains only preliminary communications made
> before the commencement of a tender offer, no signature or

---

[7] Instruction 3 reads in its entirety:

> Each pre-commencement written communication must include a
> prominent legend in clear, plain language advising security
> holders to read the tender offer statement when it is
> available because it contains important information.  The
> legend also must advise investors that they can get the
> tender offer statement and other filed documents for free
> at the Commission's web site and explain which documents
> are free from the offeror.

17 C.F.R. § 240.14d-2(b), inst. 3.

> filing fee is required.  <u>The filer need not respond to the
> items in the schedule</u>.

17 C.F.R. § 240.14d-100, inst. D (citation omitted) (emphasis
added).

Together, the 2000 reforms created a delicately balanced
scheme designed to facilitate the flow of information to
security holders.  The new regulations flag those communications
that are not formal tender offers and require detailed
disclosure once a tender offer has commenced.

The SEC was fully aware of the risk that, with the
liberalization of the rules governing communication in the
context of tender offers, investors would make investment
decisions before they had all of the information necessary to be
fully informed.  But, that risk has always been present, and the
SEC has decided to encourage the flow of information into the
marketplace with the expectation that investors will be better
informed than they were in the past.  As it explained in its
Final Release,

> [o]ne potential cost or risk of the amendments is that some
> security holders may make investment decisions based on
> information received before a complete disclosure statement
> containing the required information is filed. . . .  By
> allowing companies to publicly announce transactions
> without having to file mandated disclosure documents,
> together with the requirement that all written
> communications relating to a proposed transaction be
> publicly filed and contain a legend advising security
> holders to read the complete disclosure document when it is
> available, <u>we believe investors will have more information
> and more time to make an informed investment decision</u>.
> Further, investors will receive a mandated disclosure

document before the time they must decide whether or not to
tender in an offer.

Final Release, at *46 (emphasis supplied).


G. Section 14(e)

Section 14(e) of the Williams Act added a broad antifraud

prohibition for tender offers that was modeled on the antifraud

provisions of Section 10(b) of the Exchange Act and Rule 10(b)-

5.  Schreiber v. Burlington N., Inc., 472 U.S. 1, 10 & n.10

(1985).  Section 14(e) states in pertinent part:

> It shall be unlawful for any person to make any untrue
> statement of a material fact or omit to state any material
> fact necessary in order to make the statements made, in the
> light of the circumstances under which they are made, not
> misleading, or to engage in any fraudulent, deceptive, or
> manipulative acts or practices, in connection with any
> tender offer or request or invitation for tenders, or any
> solicitation of security holders in opposition to or in
> favor of any such offer, request, or invitation.  The
> Commission shall, for the purpose of this subsection, by
> rules and regulations define, and prescribe means
> reasonably designed to prevent, such acts or practices as
> are fraudulent, deceptive, or manipulative.

15 U.S.C. § 78(n)(e).  "Bidders are prohibited under this

section from engaging in fraudulent acts involving

misrepresentation or nondisclosure, and though the word

'manipulation' appears in § 14(e) it has not been viewed as

relating to making or withdrawing bids."  Finnegan v. Campeau

Corp., 915 F.2d 824, 830 (2d Cir. 1990).  See Schreiber, 472

U.S. at 8.

30

When enforcing Section 14(e), courts recognize that the purpose of the Williams Act provisions was to promote informed decisionmaking by shareholders, O'Hagan, 521 U.S. at 667-68, and not to discourage takeover bids.  "[T]akeover bids should not be discouraged because they serve a useful purpose in providing a check on entrenched but inefficient management."  Finnegan, 915 F.2d at 831 (citation omitted).  See also MacFadden Holdings, Inc. v. J.B. Acquisition Corp., 802 F.2d 62, 66 (2d Cir. 1986).  Section 14(e) is thus intended to insure that "shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information."  Schreiber, 472 U.S. at 8 (citation omitted).

In undertaking the 2000 reforms of disclosure obligations during tender offers, the SEC recognized the continuing risk for fraud in the tender offer context.  It observed that, "[c]ommunications that are made at any time will be subject to the antifraud provisions of Rule 10b-5 under the Exchange Act, as well as to the antifraud provisions of Rule 14a-9 and Section 14(e) if a transaction involves the proxy or tender offer rules respectively."  Final Release, at *46 (emphasis supplied).

With the specific goal of discouraging fraud in the context of pre-commencement communications, the SEC promulgated Rule 14e-8 as part of its recent amendments.  Rule 14e-8 is intended to "encourage only bona fide offers to be publicly announced and

31

minimize the potential for dissemination of false or misleading
information in the marketplace." Final Release, at *47.  The
rule provides,

> It is a fraudulent, deceptive or manipulative act or
> practice within the meaning of section 14(e) of the Act for
> any person to publicly announce that the person (or a party
> on whose behalf the person is acting) plans to make a
> tender offer that has not yet been commenced, if the
> person:
>
>> (a) <u>Is making the announcement of a potential tender
>> offer without the intention to commence the offer</u>
>> within a reasonable time and complete the offer;
>>
>> (b) Intends directly or indirectly, for the
>> announcement to manipulate the market price of the
>> stock of the bidder or subject company; or
>>
>> (c) Does not have the reasonable belief that the
>> person will have the means to purchase securities to
>> complete the offer.

17 C.F.R. § 240.14e-8 (emphasis supplied).

Rule 14e-8 is not, of course, the only rule defining acts
prohibited in the tender offer context by Section 14(e).  For
example, Rule 14e-5 prohibits a tender offeror and related
persons from purchasing securities of the target company after a
public announcement of a tender offer.  17 C.F.R. § 240.14e-5.
In addition, Rule 14e-3 prohibits insider trading.  It is a
"disclose or abstain from trading" rule.  <u>O'Hagan</u>, 521 U.S. at
669.

> One violates Rule 14e-3(a) if he trades on the basis of
> material nonpublic information concerning a pending tender
> offer that he knows or has reason to know has been acquired
> 'directly or indirectly' from an insider of the offeror or

issuer, or someone working on their behalf.  Rule 14e-3(a)
is a disclosure provision.  It creates a duty in those
traders who fall within its ambit to abstain or disclose,
<u>without regard to whether the trader owes a pre-existing</u>
<u>fiduciary duty</u> to respect the confidentiality of the
information.

<u>Id.</u> (emphasis in original)(citation omitted); <u>see also</u> <u>United</u>

<u>States v. Chestman</u>, 947 F.2d 551, 557 (1991)(en banc).


H. Application to the Instant Litigation

1. Section 14(d)

      Each of Gas Natural's three claims asserts a violation of

Section 14(d) on the ground that the E.ON TO-C made

misstatements and omissions that would be material to Endesa

shareholders as they decide whether to tender shares into E.ON's

forthcoming tender offer.  E.ON has moved to dismiss the Section

14(d) claims on the ground that the E.ON TO-C is a pre-

commencement communication, that E.ON had no obligation to

include Regulation M-A information in such communications, and

that Gas Natural has otherwise failed to identify any violation

of Section 14(d).  E.ON is correct.

      Gas Natural has failed to state a claim that the E.ON TO-C,

which E.ON filed with the SEC on November 17, violates Section

14(d).  As described above, Section 14(d) imposes obligations on

bidders at the commencement of a tender offer, and prior to that

time exempts bidders from those obligations so long as they file

their written pre-commencement communications with the SEC on
the day of the communication.  See 17 C.F.R. § 240.14d-2.
E.ON's November   filing meets each of the regulation's
requirements in this regard, and Gas Natural's complaint does
not allege otherwise.

The E.ON TO-C was filed on the date of the written
communication.  It was filed under the SEC form TO-C, with a
properly checked box indicating that it was a pre-commencement
communication.  Both of the exhibits, the Press Release and the
Preliminary Offer, contained a prominently displayed legend
advising the reader to read the final offer documents when they
become available, and advising the reader how to obtain those
documents.

In its opposition to the motion to dismiss, Gas Natural
makes that startling claim that E.ON "voluntarily assumed" the
obligations to comply with Regulation M-A's disclosure
obligations when it filed its TO-C because that document
constitutes an "Offer to Purchase."  It asserts that E.ON cannot
label the document a preliminary offer and avoid the Regulation
M-A disclosure obligations since a "reasonable shareholder" has
"no way of knowing that the document did not disclose the
material required to be included in the typical Schedule TO that
is filed when commencing a tender offer, i.e., the material,
non-public information in the possession of E.ON."

The E.ON TO-C, which is incorporated by reference into the complaint, could not be construed by a reasonable shareholder as a tender offer.  It is filed on the wrong schedule, is missing the critical terms for a tender offer (such as the final price and tender process), does not meet the SEC's definition for the commencement of a tender offer, and explicitly disavows being a tender offer.  As a consequence, reading the allegations of the complaint as a whole, including the incorporated SEC filing, Gas Natural has failed to state a claim for a violation of Section 14(d).

2. Section 14(e)

Each of Gas Natural's three claims also asserts a violation of Section 14(e).  While Gas Natural contends that E.ON made misrepresentations in its TO-C, its central concern is with purported omissions.  The thrust of its lawsuit is that E.ON had a duty to disclose non-public, material information about Endesa that it had received from either Endesa or Deutsche Bank.  Gas Natural contends that this duty arises because E.ON filed a very long Schedule TO-C that needs only a few missing pieces of information to create a complete Schedule TO-T, items such as the dates and final price of the tender offer.  In its complaint, Gas Natural asserts that it will be irreparably harmed if it does not have access the non-public confidential

information that E.ON has received from Endesa since E.ON "will have an unfair advantage in determining its bid."  Also, without access to such non-public information, shareholders cannot make an informed decision and will be deprived of a competing bid from Gas Natural that is constructed from complete and accurate information about Endesa and its communications with E.ON.  With this theory, Gas Natural misapprehends the Exchange Act and the duties it imposes upon bidders in the pre-commencement landscape.

Through the 2000 amendments to Regulation 14D and related sections of the securities laws, the SEC drew a sharp distinction between the obligations of bidders based on whether the tender offer had "commenced," a term that the SEC defined in Rule 14d-2.  While Regulation M-A requires bidders to place certain material, non-public information before the public when a tender offer is commenced, there is no such obligation created by the filing of a Schedule TO-C prior to the commencement. Simply filing a fulsome preliminary offer to purchase does not constitute the "commencement" of a tender offer or alter the duties created by the Exchange Act.  Indeed, to adopt the rule that Gas Natural advocates would have perverse consequences.  If placing extensive information into the market runs the risk of imposing upon the bidder the obligations to disclose all of the information described in Regulation M-A, then bidders may choose

36

to limit their disclosures.  This would undermine the purpose of the revisions, which as described by the SEC in the Final Release, is to "provide security holders with the broadest possible disclosure of information at the earliest date possible" in order to "better assist [them] in making well informed individual investment decisions" when confronted with news of a tender offer.  Final Release, at *17-18.

The Complaint does not allege that a tender offer has commenced.  To the contrary, it pleads that E.ON has made a "preliminary" tender offer statement.  To the extent, therefore, that Gas Natural seeks to impose on E.ON through its Section 14(e) claim the duty to disclose material, non-public information encompassed by Regulation M-A, that claim is dismissed.

Gas Natural also describes three statements in the E.ON TO-C as misstatements.  First, Gas Natural contends that E.ON falsely states that its bid was based on "public" information and "limited" diligence when it was based on non-public information received from both Endesa and Deutsche Bank.  To the extent that Gas Natural is implying that the E.ON TO-C represents that E.ON's bid was based solely on publicly available information, that allegation cannot survive scrutiny of the TO-C itself, which lists meeting after meeting and contact after contact between E.ON and Endesa as E.ON

37

investigated whether to make a tender offer and thereafter.
Moreover, the document refers to "public" information about
Endesa and E.ON's "limited" diligence in the context of
disclaiming responsibility for any misstatements that Endesa has
made publicly about itself.  In short, this claim must be
dismissed for failure to identify a misstatement.

The next allegation of a misstatement is as flawed as the
first.  Gas Natural asserts that E.ON had a duty to disclose the
risk to its tender offer posed by the Barcelona Litigation,
specifically the risk (in the event that Gas Natural is able to
show that E.ON and Endesa improperly colluded) of a declaration
that E.ON's offer is null and void as a result of its illegal
contacts with Endesa.[8]  As described above, the E.ON TO-C
describes the Barcelona Litigation at some length and explains
inter alia that the request for pre-trial proceedings "does not
imply the initiation of further jurisdictional proceedings
against the Requested Parties.  It is a pre-trial activity only,
which purpose is to furnish the requesting party with the
sufficient information to decide whether or not to file a
lawsuit."  The complaint does not contend that this description
is false.  Indeed, Gas Natural's complaint acknowledges that the

---

[8] The complaint alleges that E.ON had a duty to add this
information pursuant to 17 C.F.R. § 229.1011.  That provision is
part of Regulation M-A, and as described above, does not apply
to a pre-commencement Schedule TO-C.

documents provided to the Barcelona court "will not necessarily ever be provided to Gas Natural." Given the very preliminary nature of the Barcelona Litigation, including that the Spanish court has not yet decided even to give the requested documents to Gas Natural, the failure to describe the possible outcome of a lawsuit that Gas Natural has not yet filed, cannot be construed as a false and misleading statement. This claim is also dismissed for failure to identify a misstatement.

Finally, Gas Natural contends that the E.ON TO-C contains a misstatement when it asserts that "[e]xcept for the confidentiality agreement referred to above, neither E.ON nor E.ON 12 have reached any agreement with Endesa, the members of the board of directors of Endesa or any shareholder of Endesa in connection with the Offers." The complaint pleads the existence of three undisclosed agreements: (1) an agreement on the terms on E.ON's "initial proposed offer" prior to its announcement to the public; (2) an agreement to consult and act together to ensure the success of the E.ON bid; and (3) an agreement to permit Endesa's management and Board to retain their positions in return for Endesa signaling the price at which it would recommend an E.ON offer to its shareholders.[9]   To support these

---

[9] Count Three of the complaint includes a block quotation misidentified as Item 1016 of Regulation M-A, 17 C.F.R. § 229.1016.  This text is in fact taken from Item 1006 of Regulation M-A.  17 C.F.R. § 229.1006.  Item 1006 sets forth the

allegations, the complaint quotes extensively from press reports.

E.ON has not argued that this last Section 14(e) claim fails to meet the pleading standards of Rule 9(b) and the PSLRA. Instead, with respect to this and each of the other Section 14 (e) claims, E.ON argues that Section 14(e) does not apply to pre-commencement activity except to the extent that the SEC has enacted specific pre-commencement rules.  E.ON's position is difficult to comprehend.  It readily acknowledges Section 14(e)'s broad sweep, which gives the SEC the power to regulate pre-commencement activity through rules such as Rules 14e-3, 14e-5 and 14e-8, see O'Hagan, 521 U.S. at 672-73, but contends that Section 14(e) itself does not reach pre-commencement activity.

Section 14(e) forbids "fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer," among other things.  This broad prohibition does not use the word "commencement," or otherwise suggest that the law's reach is limited to the period in which the means to tender has been conveyed to shareholders.  The pre-commencement

---

disclosure requirements of target companies confronted by a tender offer, not prospective tender offerors such as E.ON.  Id.

communications conveyed through a Schedule TO-C are "in connection with" a tender offer, and Section 14(e)'s prohibitions apply to such communications.  As described in the complaint, at the time the E.ON TO-C was filed, not only E.ON but also Gas Natural had disclosed an intention to make a tender offer.

As characterized by the Court, Section 14(e) is a "broad antifraud provision." Schreiber, 472 U.S. at 10.  Even under the new regulatory scheme adopted by the SEC in 2000, Section 14(e) still forbids a bidder from injecting "false and misleading information into the marketplace while the tender offer remains a possibility" even though a bidder is "no longer required to commence a tender offer within a set period of time." Hartmarx, 326 F.3d at 868.

Having chosen to speak, it is not surprising that the law imposes the duty to speak truthfully.  In the context of Section 10(b), on which Section 14(e) is patterned, courts have long imposed the obligation to speak truthfully about material issues once one has chosen to speak.  See, e.g., Caiola v. Citibank, N.A., 295 F.3d 312, 331 (2d Cir. 2002); In re Sotheby's Holdings, Inc., No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000).  See also In re Digital Island, 357 F.3d at 329 n.10 (referring to duty under Section 14(e) to correct misleading statements).

41

Conclusion

The motion to dismiss is granted in part.  The Section 14(d) claims are dismissed.  The Section 14(e) claims are dismissed with the following exception.  The motion to dismiss the Section 14(e) claim based on the statement in the E.ON Schedule TO-C that E.ON had not reached any agreements with Endesa except for a confidentiality agreement is denied.


    SO ORDERED:

Dated:    New York, New York
          December 19, 2006


                                    _____
                                         DENISE COTE
                              United States District Judge

42